**Nikola MITEV, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 94–2746.

United States Court of Appeals, Seventh Circuit.

Submitted April 11, 1995.*

Decided Oct. 10, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 16, 1995.

---

* Counsel for the petitioner filed a motion to waive oral argument pursuant to Fed.R.App.P. 34(a) and (f) and Circuit Rule 34(f). Neither the petitioner nor counsel for the respondent objected to a waiver. Accordingly, we granted the motion and the appeal was submitted on the briefs and the record.

David Rubman, Chicago, IL, for Petitioner.

Janet Reno, U.S. Atty. Gen., Office of the United States Attorney General, Washington, DC, Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, James B. Burns, Office of the United States Attorney, Chicago, IL, William J. Howard, Robert Kendall, Jr., David M. McConnell, Karen Ann Hunold, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before CUDAHY, ESCHBACH and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Nikola Jordanov Mitev, a Bulgarian national, seeks review of a decision of the Board of Immigration Appeals ("BIA") denying his request for political asylum or in the alternative withholding of deportation. On September 15, 1992, the Immigration and Naturalization Service ("INS") commenced deportation proceedings against Mitev, who failed to leave the country upon expiration of his nonimmigrant visitor's visa on January 19, 1991. At a deportation hearing on November 17, 1992, Mitev admitted the allegations against him and conceded that he was deportable. With leave of the Immigration Judge ("IJ"), he applied for asylum and for withholding of deportation, pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act ("the Act"). 8 U.S.C. §§ 1158(a), 1253(h). In his application for asylum, Mitev explained that he feared political persecution if he returned to Bulgaria. Mitev incorporated an alternative request for an order of voluntary departure. 8 U.S.C. §§ 1252(b), 1254(e).[1] At a hearing on June 3, 1993, the IJ granted Mitev's request for voluntary departure but found that Mitev was ineligible for relief under either the asylum or withholding of deportation provisions of the Act. Mitev appealed. On May 27, 1994 the BIA affirmed the findings of the IJ and dismissed the appeal. We deny Mitev's petition for review and AFFIRM the decision of the BIA.

---

**1.** "Voluntary departure affords deportable aliens significant advantages by permitting them to depart for any country willing to accept them and reenter the United States once they have ob-

tained the proper documentation." *Kaczmarczyk v. INS*, 933 F.2d 588, 597 (7th Cir.1991), *cert. denied* 502 U.S. 981, 112 S.Ct. 583, 116 L.Ed.2d 608.

## I. BACKGROUND

Mitev, a 48 year-old native and citizen of Bulgaria, entered this country in July 1990 on a non-immigrant visitor's visa that authorized him to remain in the United States until January 19, 1991. According to his application for asylum and his testimony before the IJ, Mitev left his country, family, and job because he "fear[ed] for [his] life." The communist party had just won a parliamentary majority in Bulgaria and Mitev, an anti-communist, believed that his past political activity placed him in peril.

Mitev was born in Plovdiv, Bulgaria in 1947. After completing primary school and vocational training in Plovdiv, he served two years of mandatory military service. He then studied radio electronics and computer technology for several years at the university level. From 1973 until his departure from Bulgaria in 1990, Mitev worked at a computer factory in his hometown. At the time of his departure, he was a skilled technician in the machine-tool division, making what he describes as an average salary for that type of work. Mitev and his wife, Natalia, were married in 1974 and had twin boys a year later. Mrs. Mitev is employed maintaining computer banking systems. At the time of his deportation hearing, Mitev was working for an American company and sending money to his family in Bulgaria.

Mitev's difficulties had their genesis in the collapse of communism in the Soviet Bloc during the late 1980's. After the overthrow of communist dictator Todor Zhivkov in 1989, but before Bulgaria's first democratic elections in 1990, Mitev became active in Podkrepa, a recently-formed anti-communist trade union. At that time, Podkrepa was a dissident organization challenging the hegemony of the single trade union officially recognized by the state. Membership in the state-sanctioned trade union was mandatory; union fees and dues were automatically deducted from workers' salaries. Although Mitev had been adequately educated and employed within the communist system, he disliked the regimentation and "military type of mentality" that prevailed in communist Bulgaria. He was eager to spread the word about the "shortcomings and evils of the existing social order," particularly limitations on travel, lack of religious and political freedom, and Bulgaria's mistreatment of ethnic minorities. After the formation of Podkrepa, Mitev volunteered to help the organization "propagate[ ] democratic ideas and carr[y] out preparation for the forthcoming elections." Only about 10–20 of the 3,000 workers at Mitev's factory participated in Podkrepa's activities. Although he was not a leader of the organization, Mitev did attend meetings, distribute literature, and post information as an unpaid volunteer.

These activities provoked a strong response from communist party members at the factory, who threatened "lots of trouble" if Mitev and his cohorts continued their activity. Mitev stated that on one occasion, when he was posting a newspaper clipping at work, the secretary of the communist party group at the factory shoved him and tore up the clipping, saying that if Mitev cared for his life he "had better leave the country."

During a "casual conversation" at the factory in Spring of 1990, an argument arose concerning recent press reports of "death camps" in Bulgaria. An individual named Bojon suggested that Podkrepa volunteers would be "the next victims" of mass killings at these camps if they persisted in advocating reform. Lastly, Mitev testified that his brother-in-law, the first secretary of the communist party of Ivailovgrad, threatened to have Mitev jailed because of his political activities.

At his deportation hearing, Mitev explained that these warnings seemed ominous at the time because it was uncertain whether democratization would move forward or whether hard-liners would regain control in the Soviet Bloc. Instability in the Soviet Union cast a long shadow over Bulgaria, often referred to as the Soviet Union's "sixteenth republic." Should the "hard-liners return to power in the Soviet Union," Mitev testified, "we knew that the same thing would happen in Bulgaria as well."

When the Bulgarian communists gained control of parliament in June of 1990, Mitev became concerned for his safety and felt that his anti-communist political activity made

him a likely target for government persecution. Mitev left Bulgaria for the United States in July of 1990, intending to remain here only until the political situation in his own country improved. In fact, the political situation in Bulgaria has changed several times during the past five years, with anti-communists and "former communists" battling for control within the framework of a parliamentary republic.[2]

Despite the emergence of constitutional democracy in Bulgaria, Mitev remains convinced that the "true power" lies with the former communists and that it would be dangerous for him to return to his native country. At his deportation hearing, Mitev testified that he feared "interrogation and imprisonment on trumped up charges" should he return to Bulgaria.

Following the IJ's decision that Mitev was ineligible for asylum or withholding of deportation, the BIA conducted an independent review of the evidence, which included transcripts, briefs, statements, and exhibits. On the basis of this review, the BIA agreed with the immigration judge that "[Mitev] has not demonstrated his eligibility for asylum or withholding of deportation because the incidents he complains of do not rise to the level of past persecution." In light of changed circumstances within Bulgaria, including the growth of democracy and recognition of Podkrepa, the BIA also concluded that Mitev "has not established that a reasonable person in his circumstances would fear persecution upon return to Bulgaria."

## II. DISCUSSION

As we have observed in similar cases in the past, "the Act provides two procedural paths by which deportable aliens may remain [in the United States] to avoid persecution in another country." *Khano v. INS*, 999 F.2d 1203, 1207 (7th Cir.1993) (citation omitted). Mitev has attempted to travel both paths by applying for asylum under section 208(a) and by requesting withholding of deportation under section 243(h). 8 U.S.C. §§ 1158(a), 1253(h)(1). The findings of the IJ and the BIA have blocked Mitev's progress. He petitions for review.

### A. Section 208(a): Asylum

 Section 208(a) of the Act permits the Attorney General to grant asylum, in his or her discretion, to any alien who qualifies as a "refugee." 8 U.S.C. § 1158(a). The Act defines a refugee as one who is unable or unwilling to return to his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Two steps are required in order for a deportable alien to obtain relief under this section of the Act. First, the alien must establish that he is statutorily eligible for asylum (i.e., that he is a "refugee"). *Milosevic v. INS*, 18 F.3d 366, 370 (7th Cir.1994) (applicant bears burden of establishing eligibility). If eligibility is established, the Attorney General may either grant or withhold asylum in the exercise of discretion. 8 U.S.C. § 1158(a); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 1211 n. 5, 94 L.Ed.2d 434 (1987) ("It is important to note that the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee [under § 208(a) ]"). Although both the petitioner's brief and the BIA's decision discuss the standard of review for discretionary denials of asylum (abuse of discretion),[3] we would like to make clear that a discretionary denial of asylum is not at issue

---

**2.** Former communists controlled parliament from June 1990 through October 1991, when a coalition dominated by anti-communists assumed a majority. In late 1994, the former communists again regained control of the parliament. Today, the premiership and the cabinet of Bulgaria are controlled by former communists, while the presidency is held by Zhelyu Zhelev, a staunch anti-communist who was elected for a second five-year term in 1992. Podkrepa is now one of the two major trade unions in Bulgaria. The 1991 Constitution guarantees the right to form or join the trade union of one's choice, and this right is "freely exercised." *Bulgaria Human Rights Practices, 1994,* U.S. Department of State Dispatch (March 1995).

**3.** In reviewing discretionary denials of asylum, our only duty is to determine whether discretion has in fact been exercised and whether it has been exercised in an arbitrary or capricious manner. *Palacios–Torres v. INS*, 995 F.2d 96, 98 (7th Cir.1993) (citations omitted).

**1330**

in this case because Mitev failed to establish statutory eligibility.

■ We would also like to clarify that the *de novo* standard of review does not govern the central issue presented in Mitev's appeal. Although the petitioner correctly notes that *de novo* review is appropriate when the BIA has interpreted provisions of the Act, questions of law do not figure prominently in the BIA's decision in this case. *Zalega v. INS*, 916 F.2d 1257, 1259 (7th Cir.1990) (*de novo* review only appropriate to the extent case turns on interpretation of Act). The most important issue in this appeal—whether Mitev is a "refugee" and thus eligible for asylum—is a factual determination that we review under the substantial evidence test. *Urukov v. INS*, 55 F.3d 222, 227 (7th Cir.1995); *Zalega*, 916 F.2d at 1259. Applying this "highly deferential" standard, we must uphold the BIA's findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir.1992); 8 U.S.C. § 1105a(a)(4). If an asylum applicant "seeks to obtain judicial reversal of the BIA's determination, he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite [persecution or] fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 483, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992). "[A] reviewing court is not entitled to reverse 'simply because it is convinced that it would have decided the case differently.'" *Anton v. INS*, 50 F.3d 469, 472 (7th Cir.1995) (quotation omitted).

We do not believe that the evidence presented by Mitev compels a conclusion that he is eligible for asylum. Rather, the record contains substantial evidence upon which to base a finding that Mitev is *ineligible* for asylum, either because he was not persecuted in Bulgaria or because he lacks a well-founded fear of future persecution. For these reasons, we do not agree with Mitev that his case should be remanded for the BIA to determine whether he deserves asylum as a matter of discretion.

■ Mitev argues, correctly but to no avail, that a deportable alien may be found eligible for asylum on the basis of past persecution alone. *In re Chen*, 1989 WL 331860 Interim Decision 3104 (BIA 1989), 1989 BIA LEXIS 10; *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir.1991). In fact, for reasons that are not clear to this court, Mitev now focuses exclusively on this basis for asylum eligibility. The issue of whether Mitev had a well-founded fear of *future* persecution, briefed by the petitioner in the administrative proceedings below, is not addressed on appeal.

■ Although there is no statutory definition of "persecution," our cases have described it as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *De Souza v. INS*, 999 F.2d 1156, 1158 (7th Cir.1993); *see also Balazoski v. INS*, 932 F.2d 638, 642 (7th Cir.1991) (definition of persecution includes, at a minimum, conduct that threatens life or freedom). "[C]onditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum." *Sivaainkaran*, 972 F.2d at 165. A more generous interpretation of 'persecution' would "qualify the entire population of many war-torn nations for asylum" and thus make congressionally-imposed limitations on immigration virtually meaningless. *Id.*

The BIA's finding that Mitev "[did] not suffer[ ] past persecution in Bulgaria on account of his anti-communist beliefs" is supported by substantial evidence. Mitev presented no evidence of detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture. In short, he failed to establish that he suffered "punishment or harm for political, religious, or other reasons that are offensive." *Milosevic*, 18 F.3d at 370 (citations omitted).

■ Mitev asserts that the term 'persecution' is fairly broad and argues that "a *threat* to life or freedom ... may be enough to establish past persecution." A threat or threats could, under the proper circumstances, amount to persecution. *In re Acosta*, 1985 WL 56042, 1985 BIA LEXIS 2, *26, 19 I & N Dec. 211 (1985) (persecution includes

"either a threat to the life or freedom of, or the infliction of suffering or harm" upon a person for reasons regarded as offensive). However, as in much of life, "context is everything." One must identify what individual or group of individuals issued a particular threat, in what setting, and for what purpose. A death threat emanating directly from the secret police, if linked to Mitev's political activity, would surely be closer to 'persecution' than the kinds of threats made by Mitev's fellow employees at the computer factory. The IJ in this case, in his role as factfinder, asked a series of questions designed to probe the nature of the threats directed at Mitev. These questions elicited from Mitev the concession that most of the threats came from co-workers, often in the context of heated political discussion. The BIA, relying on this portion of the testimony, agreed with the IJ's assessment that these dire warnings from private individuals did not amount to persecution. With respect to Bojon's death-camp threat, the BIA observed that there was no evidence apart from Mitev's testimony to establish the existence of concentration camps in Bulgaria during this time period. More importantly, the BIA concluded that Bojon's threat "was made in an off-hand, almost causal manner [and came] from an individual who had no real authority to carry out the threat."

Because of his political activism on behalf of Podkrepa, Mitev in 1990 faced an uncertain and possibly dangerous future in Bulgaria. Our decisions, however, have recognized the hard truth that unpleasant and even dangerous conditions do not necessarily rise to the level of persecution. In fact, the BIA has denied asylum to applicants who faced much harsher conditions than Mitev, and we have upheld those decisions when supported by substantial evidence. *See, e.g., Bevc v. INS,* 47 F.3d 907, 910 (7th Cir.1995) (non-Serbian living in Serbia where non-Serbians were the victims of ethnic cleansing); *Milosevic,* 18 F.3d 366 (detention and threats of torture, warnings from the Secret Police not to return to Yugoslavia); *Zulbeari v. INS,* 963 F.2d 999 (7th Cir.1992) (interrogation and search of home by authorities); *Balazoski,* 932 F.2d 638 (interrogation, family and friends of petitioner detained and ques-

tioned); *Kaczmarczyk v. INS,* 933 F.2d 588 (7th Cir.1991), *cert. denied* 502 U.S. 981, 112 S.Ct. 583, 116 L.Ed.2d 608 (repeated arrests, frequent harassment, denial of passport, and being labeled an "anti-government activist"); *Zalega,* 916 F.2d 1257 (detention and interrogation, dismissal from job, search of apartment and confiscation of property).

By taking this approach, we are not implementing our own views of immigration policy, but are instead observing our proper role within the legal regime established by Congress:

> Immigration policy is [within] the clear purview of the legislative branch, and Congress has adopted a policy of limited asylum eligibility. The apparatus it has created for implementing that policy rests primarily with immigration judges and the BIA.... our role is limited to providing deferential review of BIA decisions.

*Sivaainkaran,* 972 F.2d at 165. This deference on the issue of eligibility for asylum is appropriate given the "extremely fact-intensive nature of [deportation] inquiries" and the superior expertise of the agencies that administer our immigration law. *Balazoski,* 932 F.2d at 642–43.

▮ In addition to finding that Mitev was not persecuted, the BIA found that Mitev lacked a well-founded fear of *future* persecution. The petitioner's brief omits a discussion of whether this was a supportable finding. Nevertheless, we address the issue because it was briefed in the administrative proceedings below and because we do not wish to leave any doubt concerning the propriety of the BIA's decision. Substantial evidence supports a finding that Mitev lacked a well-founded fear of persecution.

▮ A "well-founded fear of persecution" requires apprehension that is both subjectively present and objectively reasonable. In other words, "[a]n applicant must show not only a genuine, subjective fear of persecution, but that a reasonable person in the applicant's circumstances would fear persecution if returned to his or her native country." *Sivaainkaran,* 972 F.2d at 163 (citations omitted). The genuineness of Mitev's fear is

not disputed.[4] However, substantial evidence supported the BIA's finding that this fear was objectively unreasonable, and we will not disturb this finding on appeal.

As an initial matter, the record would support a finding that Mitev's fear of future persecution was objectively unreasonable in light of his failure to establish actual persecution in the past. Mitev "failed to present specific evidence that his encounters with the government were of such a 'magnitude and frequency' that they would cause a reasonable person to fear being singled out for persecution." *Id.* In fact, Mitev failed to establish that he had *any* encounters with government officials. He cites only threats from co-workers and a brother-in-law, whose only connections with the government were indirect (by virtue of their membership in the communist party). Mitev's family has not been harassed in his absence, nor have the authorities expressed any interest in him since his departure from Bulgaria. This either indicates that the former communists are not as powerful as Mitev claims, or that they are disinclined to pursue Mitev, a relatively low-level dissident whose anti-communist activities took place nearly five years ago.

As the BIA recognized when it considered this case, changed political and social conditions in Bulgaria are the most relevant factor in evaluating the reasonableness of Mitev's fear of persecution:

> Bulgaria is now ... a parliamentary republic ruled by a democratically elected government. Freedom of press, assembly, religion, speech, association, and travel are respected, with some significant exceptions regarding [ethnic minorities]. Therefore, [Mitev's] articulate contempt for a "military barracks mentality" with little regard for personal freedoms is no longer the norm in Bulgaria.

In denying eligibility, the IJ and the BIA relied on an advisory opinion from the State Department's Bureau of Human Rights and Humanitarian Affairs which concluded that "the situation in Bulgaria has so profoundly changed in the last few years that we do not believe incidents from the applicant's past ... would have any bearing on his treatment in Bulgaria at this time." The IJ and the BIA also relied on the State Department's annual *Country Reports* for Bulgaria, detailed documents describing conditions in Mitev's native country during 1991–93. The regulatory scheme for processing asylum applications permits the State Department to comment on pending cases, and we give great weight to that agency's opinions on matters within its area of expertise. 8 C.F.R. § 208.11 (1995); *Kaczmarczyk,* 933 F.2d at 594. We also note that the State Department's conclusions about political and human rights in Bulgaria have remained generally positive since 1993, notwithstanding the triumph of former communists in the 1994 parliamentary elections.[5]

It seems particularly unlikely that Mitev's early, low-level involvement with the Podkrepa trade union would make him a target of persecution today. At the risk of belittling Mitev's political activism, we note that he was not a particularly prominent or influential anti-communist agitator. Rather, as the BIA observed:

> [Mitev's] association with the Podkrepa trade union movement was limited to disbursing propaganda and news releases, ... membership in his factory was extremely small, and ... he was an unpaid volunteer. He was not an organizer, or leader of this movement in his place of employment.... he was never arrested or interrogated for his work on behalf of what must have been regarded at the time as a subversive organization.

Podkrepa, moreover, is no longer regarded as a subversive or dissident organization. For several years now, it has been a major political player in Bulgaria, and membership in the union of one's choice has been a consti-

---

**4.** Although the IJ made no finding as to Mitev's credibility, the BIA found his testimony credible, noting that it was largely consistent with the rest of the record.

**5.** *Bulgaria Human Rights Practices, 1994,* U.S.

tutionally-protected right since 1991.[6] In light of these dramatic changes, Mitev's fear of "interrogation and imprisonment on trumped up charges" no longer seems objectively reasonable, if ever it was.

### B. Section 243(h): Withholding of Deportation

 In order to be entitled to withholding of deportation under section 243(h) of the Act, Mitev must show that in Bulgaria his "life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h). Interpreting this language, the Supreme Court has held that a petitioner must "establish by objective evidence that it is more likely than not that he or she will be subjected to persecution upon deportation." *Cardoza–Fonseca*, 480 U.S. at 430, 107 S.Ct. at 1212. In other words, there must be a "clear probability" of persecution if the alien is deported. *INS v. Stevic*, 467 U.S. 407, 413, 104 S.Ct. 2489, 2492, 81 L.Ed.2d 321 (1984).

Obviously, this standard is more demanding than the "well-founded fear of persecution" standard contained in section 208(a) and discussed above. As the Court has noted, "one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Cardoza–Fonseca*, 480 U.S. at 432, 107 S.Ct. at 1213. Because Mitev's evidence fails to establish an objectively reasonable fear of persecution, it necessarily fails to establish a "clear probability" of persecution. The BIA's conclusions on this issue are supported by the same substantial evidence that permitted a finding of ineligibility for asylum. We therefore affirm the BIA's decision to deny withholding of deportation.

### III. CONCLUSION

Without the courage of people like Nikola Mitev, Soviet-style communism might never have collapsed. The law, however, does not permit us to grant the relief Mitev seeks.

Department of State Dispatch (March 1995).

**6.** *See* note 2; *see also* "Thousands Attend Protest Rally Organized by Trade Unions," BBC Sum-

The BIA, relying on substantial evidence, found that Mitev was not persecuted and that he lacked an objectively reasonable fear of future persecution. On appeal, we may not disturb such findings, nor may we "stretch the definition of 'refugee' to cover sympathetic, yet statutorily ineligible, asylum applicants." *Sivaainkaran*, 972 F.2d at 165.

We deny Mitev's petition for review and AFFIRM the decision of the BIA.

mary of World Broadcasts (June 29, 1995), available on LEXIS, NEWS library, CURNWS file.