Zoran **NENADOVIC** and Biljana Nenadovic, Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 96–2066.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1996.

Decided Feb. 28, 1997.

*Cunningham,* 916 F.Supp. at 820.

Y. Judd Azulay, Stephen D. Berman (argued), Azulay & Azulay, Chicago, IL, for Petitioners.

Michael J. Shepard, Office of the United States Attorney, Criminal Division, Chicago, IL, Janet Reno, U.S. Attorney General, Office of the United States Attorney General, Washington, DC, Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, David M. McConnell, Stephen W. Funk, Marion E. Guyton, Michael Lindemann, Michelle Gluck (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, Lisa Arnold, United States Department of Justice, Immigration Litigation, Washington, DC, for Respondent.

Before BAUER, COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

Zoran and Biljana Nenadovic (husband and wife, respectively), are natives and citizens of the former Yugoslavia and seek review of the affirmance by the Board of Immigration Appeals ("BIA") of the decision of an Immigration Judge ("IJ") denying their joint request for political asylum or, in the alternative, withholding of deportation.[1] The issues before us are: (1) did the BIA err when it allegedly concluded that politically-based conscription is not "persecution" under the Immigration and Nationality Act,[2] and (2) whether the decision of the BIA was supported by substantial evidence. We affirm.

## I. Background

The petitioner was hired as a quality control officer at an armaments plant in the former Yugoslavia that produced "secret" military weapons. He alleges that he was hired in order that he might play on the plant's soccer team. Nenadovic worked at the armaments plant from 1983 until his departure for the United States in 1991. Though Nenadovic testified that nearly all the workers at the plant were required to be members of the Communist Party ("Party"), he claims that he (along with most of the other soccer players) did not belong to the Party. The petitioner states that he was frequently asked to join the Party and each time he refused.

After returning from a trip to visit his grandfather in the United States, Nenadovic claims that he first expressed his anti-communist views at the armaments plant and that as a consequence of his political outspokenness, he was threatened and received rough treatment, though he has failed to offer details of the threats or alleged mistreatment. The petitioner alleges that he spoke out in the plant against the Party, the Milosevic regime and the lack of freedom in the former Yugoslavia. He was also warned by other members of the soccer team that he would "get [in] trouble for that" and told by his managers that he should "think what [he] is talking about."

Although Nenadovic was not drafted, he testified that when war broke out in Vucovar, Croatia in 1991, five non-Party members of the soccer team were drafted and sent to fight in the war, while Party members were not drafted.[3] He also alleged that his manager at the plant, a Party member, told him that he would be the next person sent to the front. (The petitioner stated that he believed his plant manager's threats that he

---

1. Pursuant to section 1158(a) of Title 8, a "spouse ... of an alien who is granted asylum ... may, if not otherwise eligible for asylum ... be granted the same status as the alien if accompanying, or following to join, such alien." Biljana Nenadovic's asylum request is encompassed within her husband's application. As such, further reference to petitioners will be to the single petitioner, Zoran Nenadovic.

2. 8 U.S.C. § 1101 *et seq.*

3. According to Nenadovic, the Serbian Army was targeting civilians in Vucovar based upon their ethnic or religious backgrounds.

would be the next person sent to the front because of his boss' "military connections," but he has not elaborated upon these alleged connections.) Nenadovic also claims that he received a call from the military to pick up his uniform the same week that his boss threatened to have him sent to the front.[4] Furthermore, on the very same day after he picked up his uniform, he applied for and obtained a visa from the United States Embassy in Belgrade and left the country for the United States the following week. Nenadovic does not know if a draft notice was ever issued but he is fearful that if he were to return to the former Yugoslavia, he would be arrested and punished for leaving the country to avoid conscription. Because he was an outspoken anti-communist critic of the Milosevic regime, speaking against it almost daily, and because he was a "famous soccer player in Yugoslavia," the petitioner-appellant claims that if he returned to his native country, "no matter where he lived, he would be recognized and punished." Nenadovic did not, however, mention his notoriety as a soccer player when he applied for asylum.

On April 22, 1994, the petitioner was issued an Order to Show Cause and Notice of Hearing by the Immigration and Naturalization Service ("INS") which recited that he had remained in the United States beyond his November 28, 1991 visa authorization date and was, thus, subject to deportation. At this time, Nenadovic filed an application for asylum[5] and withholding of deportation pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act ("the Act"), 8 U.S.C. §§ 1158(a), 1253(h), or in the alternative, an order of voluntary departure.[6] The IJ denied his application for asylum, ruling that he had failed to establish a well-founded fear of future persecution, and ac-

cordingly also denied his application for a withholding of deportation because he did not meet the heavier burden of demonstrating a "clear probability"[7] of persecution. The IJ did, however, grant the petitioner's request for voluntary departure, giving him until December 31, 1995 to depart from the United States of his own accord.

On May 18, 1995, Nenadovic appealed the IJ's denial of asylum and withholding of deportation to the BIA, which dismissed his appeal on February 16, 1996. In his appeal to this court, the petitioner argues that (1) the BIA erred when it allegedly concluded that conscription based solely on a person's political beliefs is not "persecution" under the Act, and (2) the BIA's finding that he lacked a well-founded fear of persecution is not supported by substantial evidence.

## II. Discussion

A petitioner may be granted asylum if the Attorney General, in the exercise of his or her discretion, determines that he is a "refugee." 8 U.S.C. § 1158(a). The Act defines "refugee," in relevant part, as a person who is "unwilling" to return to his own country because of "persecution or a well-founded fear of future persecution on account of ... political opinion...." 8 U.S.C. § 1101(a)(42)(A).[8] "Although there is no statutory definition of 'persecution,' our cases have described it as 'punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate.'" *Mitev v. INS,* 67 F.3d 1325, 1330 (7th Cir.1995) (citation omitted). "[T]he Attorney General is not required to grant asylum to everyone who meets the definition of refugee. Instead, a finding that an alien is a refugee does no more than establish that

---

**4.** Petitioner previously served a 15–month term of compulsory military service beginning in 1980.

**5.** Petitioner had previously filed an application for asylum in 1992, but the record does not indicate what action, if any, was taken by the INS.

**6.** *See* 8 U.S.C. §§ 1252(b), 1254(e). "Voluntary departure affords deportable aliens significant advantages by permitting them to depart for any country willing to accept them and reenter the

United States once they have obtained the proper documentation." *Kaczmarczyk v. INS,* 933 F.2d 588, 597 (7th Cir.1991).

**7.** *See INS v. Stevic,* 467 U.S. 407, 430, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984).

**8.** Refugee status can also be established on the basis of a well-founded fear of future persecution on account of "race, religion, nationality, [or] membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A).

'the alien may be granted asylum *in the discretion of the Attorney General.'* " *INS v. Cardoza–Fonseca,* 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 1211 n. 5, 94 L.Ed.2d 434 (1987) (citation omitted) (alteration in original); *see also Mitev,* 67 F.3d at 1329. "The petitioner bears the burden of proving his statutory eligibility...." *Krastev v. INS,* 101 F.3d 1213, 1216 (7th Cir.1996). The BIA's determination that the petitioner was not eligible for asylum must be upheld if supported by "reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4); *see also Mitev,* 67 F.3d at 1330. This standard of review is " 'highly deferential.' " *Id.* (citation omitted). "This deference ... is appropriate given the 'extremely fact-intensive nature of [deportation] inquiries' and the superior expertise of the agencies that administer our immigration law." *Id.* at 1331 (citation omitted). "[A] reviewing court is not entitled to reverse 'simply because it is convinced that it would have decided the case differently.' Rather, the Board's decision can be reversed 'only if the evidence presented by [the petitioner] was such that a reasonable fact finder would *have* to conclude that the requisite fear of persecution existed.' " *Anton v. INS,* 50 F.3d 469, 472 (7th Cir.1995) (emphasis added) (citation omitted). "To reverse [a] BIA finding we must find that the evidence not only supports that conclusion, but *compels* it." *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 815 n. 1, 117 L.Ed.2d 38 (1992).

## A. Conscription Based Upon Political Beliefs As Persecution

■ Nenadovic argues that the BIA erred as a matter of law in "conclud[ing] that conscription, when conducted to punish people for their political opinions, is not persecution"

under the Act. Appellant's Br. at 23. We believe that the petitioner misstated the BIA's holding and as a result has incorrectly framed the issue before us. The BIA found, in relevant part, that

> [t]he punishment [petitioner] allegedly fears as a result of his refusal to perform military service does not constitute persecution, since he has not established that it would encompass the infliction of harm or suffering in a way regarded as offensive. *Desir v. Ilchert,* 840 F.2d 723 (9th Cir. 1988). Incarceration alone does not constitute persecution. *Zalega v. INS,* 916 F.2d 1257, 1260 (7th Cir.1990). Despite [petitioner's] assertion that he would face severe punishment or death as a result of his avoiding conscription, he has supplied no evidence that *he would be subject to these measures....*

R. at 4 (citation omitted) (emphasis added). We interpret the above-quoted paragraph as stating that (1) punishment for avoiding conscription is not *necessarily* persecution,[9] and (2) even if it was, Nenadovic failed to offer any evidence that such punishment awaited him upon his return to the former Yugoslavia. The BIA arguably implied that conscription as punishment for political opinions could amount to persecution when it stated that "[petitioner] has failed to establish that the conscription laws *as applied to him* ... are merely a pretext to persecute him for his beliefs...." R. at 4 (citations omitted) (emphasis added). However, even if we accept petitioner's characterization of the BIA's holding, we need not address the broader question of whether politically-based conscription is "persecution" because Nenadovic has failed to establish a well-founded fear of future persecution, the issue on which this case ultimately turns.[10]

---

9. *See Krastev,* 101 F.3d at 1217 ("[I]t is not 'persecution' for a government to require military or an alternative service of its citizens.")

10. Though inconsistent with his contention that the BIA held that politically-based conscription is not persecution, the petitioner also argues that the BIA failed to consider whether conscription as punishment for political beliefs constitutes persecution. Nenadovic argues that this alleged failure, together with consideration of alleged irrelevant matters, renders its decision erroneous

as a matter of law. However, the BIA did address the issue of politically-based conscription (as it must have if petitioner also claims that the BIA erroneously held that conscription as punishment for political opinions is not persecution) and found that petitioner-appellant failed to demonstrate that his apparent selection for military service was a pretext.

## B. Fear of Persecution

The petitioner argues that he has a well-founded fear of future persecution because, prior to his departure for the United States in 1991, he was allegedly on the verge of being drafted and sent to the front in retaliation for his expression of anti-communist views. If forced to return, he is fearful that he will be punished for having avoided conscription. Such punishment, the petitioner alleges, would be based upon his well-known political beliefs. The BIA found that Nenadovic lacked a well-founded fear of future persecution, noting that he had failed to produce any "evidence to substantiate *any connection* between his [political] activities on the job and his apparent selection by the army for additional service in 1991." R. at 6 (emphasis added). Our review of the record persuades us that the BIA finding was proper.

The petitioner states that the "fact that [his] supervisor told him he would be sent to Vucovar *supports* a finding that the conscription was a mere pretext to persecute him." Appellant's Br. at 27. Though Nenadovic attempts to buttress this claim with his assertion that five non-Party members of his soccer team were drafted and sent to Vucovar, he concedes that they were not, like himself, outspoken anti-communists. Thus, it is entirely possible that their induction into the military was not motivated in any way by political animus. Relying selectively upon a May 1994 State Department document entitled "Profile of Asylum Claims and Country Conditions" ("Profile") in the former Yugoslavia,[11] the petitioner argues that his high visibility as a "famous" soccer player and "outspoken critic" would place him at risk of persecution by the Milosevic regime. The State Department Profile does not paint quite the ominous picture that Nenadovic describes. It states that

> Serbia has a multi-party system but *vocal* and *highly visible* opposition *to Milosevic and his policies could* put a person at risk, depending upon whether Milosevic considers it a serious threat. Nonetheless, opposition parties exist and *most of their adherents suffer no consequences* (emphasis added).[12]

■ We observe that Nenadovic failed to mention his occupation as a "famous" soccer player on either his 1992 or his 1994 asylum applications. Assuming, however, that he was an outspoken anti-communist critic of the Milosevic regime during a reputable soccer career, these facts along with his selection for military service may, as petitioner argues, *support*, but they certainly do not *compel*, a finding that he has a well-founded fear of persecution upon his return to his homeland. We, like the IJ, are not convinced that a politically outspoken soccer player of some prominence would necessarily be considered, in the words of the State Department Profile, a "serious threat" to the Milosevic regime in Serbia were he to return to the former Yugoslavia at this point in time.

Nenadovic has less reason to fear persecution than the petitioner in *Mitev, supra,* a Bulgarian citizen who sought asylum, alleging that he had been persecuted because of his anti-communist views. Mitev's co-workers had physically and verbally threatened him, with one member of the factory's communist union warning him that he had better leave the country if he "cared for his life." Mitev's brother-in-law, the first secretary of the communist party, had threatened to have

---

11. Pursuant to 8 C.F.R. § 208.11, the "Department of State may provide detailed country conditions information addressing the specific conditions relevant to eligibility for refugee status according to the grounds specified in ... 8 U.S.C. § 1101(a)(42)." Consistent with this regulatory grant of authority, the Profile states that its purpose is to

> help adjudicators assess the accuracy of asylum applicants' assertions about country conditions and their own experiences; likely treatment were the applicants to return; whether persons similarly situated are known to be persecuted; whether grounds for denial are known to exist; and other information deemed relevant.... This paper focuses on helping adjudicators sort out such claims in what is still a rapidly changing environment which may take several months or years to stabilize.

R. at 129.

12. "[W]e give considerable weight to th[e State] Department's opinion in matters concerning international affairs, its area of expertise." *Kaczmarczyk v. INS,* 933 F.2d 588, 594 (7th Cir. 1991).

him jailed for his anti-communist views. In 1990, when the communists gained control of the Bulgarian Parliament, Mitev came to the United States, believing that he would be targeted for government persecution in his native land.

Nonetheless, this court affirmed the BIA's denial of Mitev's petition for asylum because, like Nenadovic in the instant case, Mitev "presented no evidence of detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Id.* at 1330. While noting that Mitev faced an uncertain and possibly dangerous future in Bulgaria, we observed that

> [o]ur decisions ... have recognized the hard truth that unpleasant and even dangerous conditions do not necessarily rise to the level of persecution. In fact, the BIA has denied asylum to applicants who faced much harsher conditions than Mitev, and we have upheld those decisions when supported by substantial evidence. *See, e.g., Bevc v. INS,* 47 F.3d 907, 910 (7th Cir. 1995) (non-Serbian living in Serbia where non-Serbians were victims of ethnic cleansing); *Milosevic [v. INS],* 18 F.3d 366 [ (7th Cir.1994) ] (detention and threats of torture, warnings from the Secret Police not to return to Yugoslavia); *Zulbeari v. INS,* 963 F.2d 999 (7th Cir.1992) (interrogation and search of home by authorities); *Balazoski [v. INS],* 982 F.2d 638 [ (7th Cir. 1991) ] (interrogation, family and friends of petitioner detained and questioned); *Kaczmarczyk v. INS,* 933 F.2d 588 (7th Cir. 1991) (repeated arrests, frequent harassment, denial of passports, and being labeled an "anti-government activist"); *Zalega [v. INS],* 916 F.2d 1257 [ (7th Cir.1990) ] (detention and interrogation, dismissal from job, search of apartment and confiscation of property). ·

*Mitev,* 67 F.3d at 1331. Like Mitev, the petitioner has " 'failed to present specific evidence that his encounters with the government were of such a "magnitude and frequency" that they would cause a reasonable person to fear being singled out for persecution.' " *Id.* at 1332 (citation omitted). In fact, Nenadovic has "failed to establish that

he had *any* encounters with government officials," *Id.* at 1332, and cites only the alleged threats of his manager at the armaments plant, whose connection with the government is, at best, unclear from the record. Like Mitev, he "cites only threats from . [those] whose connections with the government were indirect (by virtue of their membership in the communist party)." *Id.* As in *Mitev,* there is no evidence that the petitioner's "family has ... been harassed in his absence [petitioner's grandfather and wife Biljana's parents and brother still live in the former Yugoslavia], nor have the authorities expressed an interest in [Nenadovic] since his departure" from the former Yugoslavia. *Id.* The petitioner, therefore, has failed to demonstrate that he was and/or will be subjected to persecution, let alone persecution for his political views.

### III.  Conclusion

Under the terms of the Immigration and Nationality Act, Nenadovic bore the burden of establishing that he was eligible for asylum and/or withholding of deportation on account of his status as a "refugee" as that term is defined in the Act. The BIA found that he had not done so, and its decision was supported by substantial evidence. We affirm.