139 F.3d 901
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Lioudmila MALIAVKINA, Petitioner,
v.
Immigration and Naturalization Service, Respondent.
 No. 97-2366.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 27, 1998.
Decided Mar. 6, 1998.
 
 Petition for Review of a Decision of the Board of Immigration Appeals. No. Ace-hyr-plv.
 Before Hon. JESSE E. ESCHBACH, Hon. JOHN L. COFFEY, Hon. FRANK H. EASTERBROOK, Circuit Judges.
 
 ORDER
 
 1
 Lioudmila Maliavkina, a Latvian Jew, petitions this court for review of a Board of Immigration Appeals (BIA) decision denying her petition for asylum and withholding of deportation. Because we find that the BIA's findings are supported by substantial evidence, we affirm.
 
 I. Facts
 
 2
 Lioudmila Maliavkina is a 58-year-old divorced Russian Jew who lived in Latvia for 28 years prior to coming to the United States. She entered the United States on a visitor's visa on January 15, 1993. She overstayed her visa, and applied for asylum initially in May 1994. This application was denied on August 29, 1995, and the INS issued an Order to Show Cause to Maliavkina on August 31, 1995. Maliavkina conceded deportability at her deportation hearing in February 1996, and reapplied for asylum and withholding of deportation.
 
 
 3
 At her hearing, Maliavkina testified that in 1965 she moved to Riga, Latvia's capital, while Latvia was a part of the Soviet Union. She claims that anti-Semitism in Latvia increased when the pro-independence movement began forming in 1988. She claims that in March 1989, she spoke on behalf of Russians and Jews at a rally against the All-Latvian Nationalist Front. About a month later, a man collecting signatures in support of an illegal pro-Nazi group entered her home, knocked her down and kicked her after she told him that his group was illegal. Later that year, a smoke bomb was placed under the door to her apartment, and the next day a note appeared in her mailbox that read "Kike, get out of Latvia and mind your own business."
 
 
 4
 In December 1989, while walking home one day, Maliavkina was attacked by three men and one woman, who pushed her in the chest with "a sharp stick" and whacked her in the knee with a heavy object while shouting anti-Semitic remarks. As a result of the attack, Maliavkina's kneecap was broken and had to be entirely removed. After the attack, Maliavkina began receiving anti-Semitic hate mail.
 
 
 5
 Maliavkina also testified that she believed that she and her daughter received substandard medical care in 1990 and 1991 because they were Jewish. She bases this belief on anti-Semitic statements made by medical personnel when they were questioned about the adequacy of the treatment they gave.
 
 
 6
 Lastly, Maliavkina testified that in November 1992, she attended a concert of Jewish musicians in Riga. After the concert, a crowd holding anti-Semitic placards that had assembled outside of the concert began attacking the concertgoers. Maliavkina screamed at the attackers and was kicked in the stomach several times. Maliavkina and five others were arrested by the police and taken to a police station where they were interrogated individually. Maliavkina testified that she was accused of yelling anti-Latvian obscenities. She claims that the police told her to leave the country or they would press charges against her and she would go to jail. Soon afterwards, she received an anonymous letter stating "it is [your] choice--Israel or Shmerle cemetery [Riga's Jewish cemetery]." She left Latvia in January 1993.
 
 
 7
 In an oral ruling, the Immigration Judge (IJ) denied Maliavkina's requests for asylum and withholding of deportation. The BIA affirmed, indicating that Maliavkina did not experience persecution in Latvia, and that she did not have a well-founded fear of persecution should she return. The BIA based its ruling that Maliavkina did not have a well-founded fear of future persecution on the State Department's profile of anti-Semitism in Latvia.
 
 II. Analysis
 A. Standard of Review
 
 8
 The determination whether an alien is a refugee, and therefore eligible for asylum, is a question of fact reviewed under the substantial evidence test. See Angoucheva v. INS, 106 F.3d 781, 788 (7th Cir.1997). The BIA's findings should be affirmed when they are "supported by reasonable, substantial, and probative evidence on the record as a whole." 8 U.S.C. § 1105a(a)(4).[1] A reviewing court should reject the BIA's factual findings only when the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." INS v. Elias-Zacarias, 502 U.S. 478, 483-84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).
 
 B. Past Persecution and Well-Founded Fear
 
 9
 To qualify as a refugee, an alien must be "unable or unwilling to return" to her country of origin because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. § 1142(a)(42)(A). In her asylum application, Maliavkina's claimed that she had been persecuted on three grounds; religion, political opinion, and social group. However, in both of her appeals, she has argued only that she was persecuted on account of her religion. Her arguments for persecution on the other two grounds are therefore waived. See Bereza v. INS, 115 F.3d 468, 474 (7th Cir.1997).
 
 
 10
 Maliavkina testified to three physical attacks that occurred because of her religion. In March of 1989, a pro-Nazi group member entered her home, knocked her down, and kicked her. In December of 1989, four people assaulted her in a park and severely and permanently damaged her knee. In November of 1992, petitioner fell in a crowd and was repeatedly kicked in the stomach; police subsequently arrested petitioner and told her to leave the country or face imprisonment.
 
 
 11
 Petitioner submitted objective evidence as well. She submitted a medical report that evidences her knee surgery following the assault. She also submitted a Life magazine article from December 1992 which stated that carpets decorated with swastikas hang openly in downtown stores, and it is not uncommon to see men on the streets of Riga wearing the Iron Cross. The U.S. State Department Country Report for 1994 was also critical of Latvia. The report indicates that by the end of 1994, Latvia had failed to introduce a national program that would protect the rights of non-citizens. The report states that police and security forces continue to use violence and excessive force, occasionally resulting in death, and the government has not yet taken adequate disciplinary action against those responsible. Petitioner also submitted more recent documentation. Russian news articles about Latvia reported in 1995 that there were public displays of swastikas and signs stating "Judenfrei."
 
 
 12
 Petitioner has suffered a debilitating injury on account of her religion, and she has submitted a medical report and independent news accounts to corroborate her story. We will assume, without deciding, that the maltreatment petitioner suffered in 1989 rises to the level of past persecution.[2]
 
 
 13
 Past persecution creates a presumption in favor of granting asylum. Skalak v. INS, 944 F.2d 364, 365 (7th Cir.1991). However, the presumption is rebuttable. "Although a showing of past persecution ordinarily entails a presumption that the applicant has a well-founded fear of persecution, this is not so when conditions in the country from which he was fleeing have changed 'to such an extent that the applicant no longer has a well-founded fear of being persecuted if he were to return." ' Bereza, 115 F.3d at 472 (quoting 8 C.F.R. § 208.13(b)(1)(I)).
 
 
 14
 Relying on the 1996 State Department Report, the BIA concluded that even if petitioner suffered past persecution, there is little chance of future persecution upon her return to Latvia. We agree with the BIA's conclusion. Although petitioner suffered severe maltreatment in 1989, the State Department reports that "official discrimination against Jews ... ended with the end of communist rule in 1991." BIA Order at 2 (quoting 1996 State Department Report). Latvia has undergone dramatic political change since petitioner fell victim to anti-Semitic attackers in 1989.
 
 
 15
 Even though petitioner submits some evidence of oppressive conditions following the political transformation, the State Department concluded that conditions for Jews in Latvia are no longer perilous. The 1996 report deems the situation of the Jewish community in Latvia "generally tranquil" despite some manifestations of anti-Semitism such as destruction of a synagogue in 1995 and desecration of cemeteries. In addition, suggestions of a fascist revival (the sort alleged by petitioner) have been explicitly denied by leaders of Latvia's Jewish community, and the State Department sees no evidence to support such allegations.
 
 
 16
 The most recent documentary evidence petitioner submits consists of Russian news articles from 1995 that describe anti-Jewish sentiment in Latvia and some open support for Nazism. However, these accounts describe isolated incidents and they neither discredit nor overcome the 1996 State Department report. See Gramatikov v. INS, 128 F.3d 619, 620 (7th Cir.1997) ("[Petitioner] had better be able to point to a highly credible independent source of expert knowledge if he wants to contradict the State Department's evaluation of the likelihood of his being persecuted if he is forced to return home, an evaluation to which courts inevitably give considerable weight."). The 1996 State Department report thus provides substantial evidence that a well-founded fear of persecution is no longer objectively reasonable for petitioner if she returns to Latvia.
 
 C. Withholding of Deportation
 
 17
 The "clear probability or persecution" standard for withholding of deportation is higher than the "well-founded fear of persecution" standard for asylum. See Mitev v. INS 67 F.3d 1325, 1333 (7th Cir.1995). Thus, since Maliavkina did not show a well-founded fear of persecution, she cannot meet the standard for withholding of deportation. The decision of the BIA is
 
 AFFIRMED
 
 
 [1]
 § 1105a was repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. 104-208 § 306(b), 110 Stat 3009, 3009-612. However, under the transitional judicial review procedures established by IIRIRA, § 1105a(a) continues to be the appropriate standard of review for aliens whose deportation proceedings were in progress on the effective date of the Act. Id. § 309
 
 
 [2]
 The petitioner has only alleged that one incident, the 1992 assault, included any governmental involvement. Our circuit has recognized that persecution may arise from local authorities and their private supporters as well as the national government. See Hengan v. INS, 79 F.3d 60, 62 (7th Cir.1996) (recognizing theory of relief where petitioner "did not argue that the national government of Romania persecutes Hungarians [but] contend[ed] that the national government is unwilling or unable to control local persecutors" such as the Mayor, police, and their supporters). We assume, arguendo, that the government here was "unwilling or unable to control local persecutors."