**Gezim Gani TOPALLI, Petitioner,**

v.

**John ASHCROFT, Attorney General of the United States, Respondent.**

No. 04–1067.

United States Court of Appeals, Seventh Circuit.

Submitted Nov. 23, 2004.*

Decided Jan. 4, 2005.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the case is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

134

Gezim G. Topalli, Elgin, IL, pro se.

George P. Katsivalis, Department of Homeland Security, Office of the District Counsel, Chicago, IL, Keith I. Bernstein, Department of Justice Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before BAUER, MANION, and WOOD, Circuit Judges.

## ORDER

Gezim Topalli, an Albanian union leader, petitions for review of the BIA's denial of his application for asylum. The IJ ordered Topalli removed from the United States on the grounds that his account of alleged threats by the Albanian security services was not credible, and that even if the facts he alleged were true, they would not warrant a grant of asylum. The BIA

summarily affirmed on both grounds. We deny Topalli's petition for review of the BIA's order.

In Albania, Topalli worked as an electrician at an oil and gas company that was partially owned by the state, and he served as the chairman of the local branch of the Petroleum Employee's Independent Trade Union. In this capacity, he organized and participated in numerous demonstrations against unfair "labor practices" and was otherwise outspoken in his activism on behalf of petroleum workers. Topalli also used his position as a platform to criticize the Albanian government's corruption and ties to organized crime. For example, he organized protests and published political poetry. His political agitation and union activities, however, earned him the enmity of members of the state security services. He fled Albania in October 2000, leaving behind his soon-to-be ex-wife and two children (aged eight and twelve at the time), and entered the United States on a six-month visitor's visa.

Topalli testified that he was persecuted because of his union activism on a number of occasions. While he was working on an outdoor electrician's assignment with a colleague in 1998, an unknown rifleman fired several shots in his direction. Topalli admitted, in response to questions from the IJ, that he neither saw who had fired the shots nor recalled when in 1998 this incident occurred: "I didn't think of it, in the beginning, as an attempt to assassinate or to kill me; but, then, when I discussed it with my lawyer, he said that you probably should look at it this way." Topalli testified that he was threatened "countless" times, and he discussed three incidents in particular. First, sometime in 1998, he and the "general secretary of the unions" were stopped by "private policemen" while heading toward a union meeting and warned, "Go back, because you are going

to get in trouble, or you are going to get it bad." Second, again sometime in 1998, while organizing a workers' rights protest, Topalli was approached by a police officer who used "bad words" and told him, "You, you are the one who has to go away, because you are the one organizing this." The context surrounding the third incident is unclear from Topalli's testimony. He testified, however, that at some point in 1998 or 1999—again, he could be no more specific—a "policeman" who worked for the oil and gas company told him, presumably in connection with his union activities, "You are going to be in danger, or it's going to cost you your life."

Topalli applied for asylum in July 2001, and the INS initiated removal proceedings several months later. Topalli asserted in his asylum application that the shooting incident and threats constituted persecution and caused him to fear returning to Albania. The IJ denied Topalli's claim and ordered him removed from the United States. He found Topalli not credible because "he provided vague testimony regarding critical elements of his asylum claim"—for instance, in being unable to specify when the shooting and threats occurred. The IJ also observed "material discrepancies" in Topalli's claim, such as his assertion that he divorced his wife in order to protect her from his aggressors, even though a divorce decree attributed the divorce to the fact that their "characters were different" and noted that Topalli had "insulted and beat" his wife. Even if Topalli's narrative were credible, the IJ continued, Topalli still failed to establish that he had suffered past persecution or had a well-founded fear of future persecution because "threats alone do not rise to the level of persecution." The BIA summarily affirmed in a one-paragraph order.

We review the IJ's denial of Topalli's requests for relief under the highly defer-ential substantial evidence test. *Hasanaj v. Ashcroft*, 385 F.3d 780, 781 (7th Cir. 2004). Under that standard, "we must uphold the IJ's findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole; we may reverse the IJ's determinations only if we determine that the evidence *compels* a different result." *Id.* (quoting *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir.2004)) (emphasis in original).

■ Topalli first challenges the IJ's determination that his testimony was not credible. He argues that his inability to date the shooting or the police threats shows not that he is incredible but rather that he honestly could not recall when the incidents occurred. Topalli also disputes the IJ's statement that he did not allege experiencing any mistreatment after 1998; he maintains that he testified that the persecution intensified after he published political poems in 1999 and 2000 and persisted until he left Albania in October 2000. But we accord substantial deference to an IJ's credibility determination if it is supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir.1999) (quotations omitted). An adverse credibility finding should not be overturned simply because substantial evidence could support an alternate conclusion. *Capric v. Ashcroft*, 355 F.3d 1075, 1086–87 (7th Cir.2004). To the contrary, it takes "extraordinary circumstances" to justify reversing the IJ's credibility determination. *Id.* at 1087 (quoting *Pop v. INS*, 270 F.3d 527, 531 (7th Cir.2001)). If the alien is found to be incredible, he cannot meet his burden of proof without providing a "convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence." *Id.* at 1086.

Here, the IJ supported his conclusion that Topalli's testimony was not credible with specific, cogent reasons. The IJ was entitled to draw an adverse credibility inference from the fact that Topalli's divorce decree undercut his stated reason for divorcing his wife. That inconsistency was further highlighted by the fact that, while Topalli maintains communication with his two children, he has not spoken to his wife since leaving Albania. The IJ also permissibly noted that Topalli did not allege any specific instances of mistreatment after 1998, despite his general testimony that the persecution intensified in 1999 and 2000. Topalli's brief on appeal continues to make this general assertion but describes no specific incidents. Finally, the IJ was permitted to infer from Topalli's inability to provide even general dates for the shooting and threats that these encounters were not nearly as serious as Topalli had made them out to be. In short, this is not an extraordinary case in which the evidence compels a reversal of the IJ's credibility determination.

■ Even if we gave full credence to Topalli's story, substantial evidence supports the IJ's conclusion that the threats he suffered do not make him eligible for asylum. Topalli argues that the "many threats" he received in connection with his union leadership placed him in "great danger" and show that he would have been harmed eventually. Thus, he claims, he meets the definition of a refugee under 8 U.S.C. § 1101(a)(42)(A): an individual who fears returning to his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

Only the most immediate and menacing of threats can constitute persecution. *Ahmed v. Ashcroft*, 348 F.3d 611, 616 (7th Cir.2003); *Boykov v. INS*, 109 F.3d 413,

416–17 (7th Cir.1997). This court has been reluctant to find that mere threats require a finding that an applicant is entitled to asylum, holding in several cases that more egregious threats than those at issue here *could*, not *must*, support a finding of persecution. See *Mousa v. INS*, 223 F.3d 425, 430 (7th Cir.2000) (repeated searches, interrogations, and menacing phone calls by police over the span of five years); *Hengan v. INS*, 79 F.3d 60, 62–63 (7th Cir.1996) (written and telephoned threats accompanied by property defacement and a symbolic dead animal); see also *Mitev v. INS*, 67 F.3d 1325, 1331 (7th Cir.1995) (no persecution where threats were made by co-workers during heated political discussions). Furthermore, we have emphasized the importance of context in evaluating whether threats constitute persecution, exploring who issued the threat, in what setting, and for what purpose. *Mitev*, 67 F.3d at 1331.

The threats Topalli describes fall short of compelling a conclusion contrary to the one that the IJ reached. Topalli's vague testimony tends to show that the purpose of the threats was not to foreshadow actual violence, but simply to scare him away in one instance and to intimidate him in another. In other words, it does not appear that the police officers themselves were inclined to carry out the threats they were making, which undercuts Topalli's claim that they rise to the level of persecution. Topalli's assertion that state actors tried to carry out these threats—as did the assailants in *Roman v. INS*, 233 F.3d 1027, 1035 (7th Cir.2000)—by trying to shoot him is unpersuasive. No evidence in the record connects the alleged shooting incident from 1998 to the Albanian government, Topalli's speculation to the contrary notwithstanding.

■ Topalli also claims that he has a well-founded fear of future persecution if he were returned to Albania. He asserts

generally that if he continues to advocate for workers there, the government will be "unable to control" his pursuers, who will make good on their threats. Because Topalli did not prove past persecution, he must demonstrate a subjective fear of returning to Albania that is objectively reasonable in order to establish a well-founded fear of future persecution. See *Diallo v. Ashcroft*, 381 F.3d 687, 697 (7th Cir. 2004); 8 C.F.R. § 208.13(b)(1). Substantial evidence, however, supports the IJ's conclusion that Topalli's fear of persecution is not objectively reasonable. Topalli failed to meet his burden of introducing specific evidence to show that the "magnitude and frequency" of the government's alleged actions—which in no way harmed Topalli physically—would cause a reasonable person to fear returning to Albania. See *Mitev*, 67 F.3d at 1332. Furthermore, the fact that Topalli's ex-wife and two children have suffered no threats or harm since he fled Albania also undermines his claim of well-founded fear of future persecution. See *Sofinet v. INS*, 196 F.3d 742, 747 (7th Cir.1999); *Mitev*, 67 F.3d at 1332.

Topalli's petition describes an additional incident in which he was allegedly beaten by police because his family owned a parcel of land coveted by a government official. Topalli did not testify at his hearing about the incident, though he did mention it in his brief to the BIA. If Topalli wanted to submit new evidence, however, he should have submitted it to the BIA as part of a motion to reopen, 8 C.F.R. § 1003.2(c). Absent the appropriate motion, the BIA is precluded from considering new evidence on appeal. See *id.* § 1003.1(d)(3)(iv); *Reyes–Hernandez v. INS*, 89 F.3d 490, 494 (7th Cir.1996).

DENIED.