151 F.3d 1034
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Iosif VURA, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 97-3325.
 United States Court of Appeals, Seventh Circuit.
 Argued April 29, 1998.
May 22, 1998.
 
 Appeal from the Board of Immigration Appeals.
 Before Hon. JESSE E. ESCHBACH, Hon. JOEL M. FLAUM, Hon. DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 An Immigration Judge (IJ) and the Bureau of Immigration Affairs (BIA) determined that Iosif Vura was ineligible for asylum and withholding of deportation because he had not suffered past persecution and did not have a well-founded fear of future persecution. See 8 U.S.C. §§ 1158, 1253(h). Vura challenges that determination, claiming that he is a refugee due to past economic persecution based on his Hungarian ethnicity and that he has a well-founded fear of future persecution.
 
 
 2
 Vura, an ethnic Hungarian, is a native and citizen of Romania. He entered the United States in 1991 and applied for asylum in 1992. His application was denied and an Order to Show Cause was issued. In 1995, Vura appeared before the IJ and admitted deportability, but argued that he had been the victim of persecution based on his Hungarian ethnicity.
 
 
 3
 At his deportation hearing, Vura submitted newspaper articles and documents from Human Rights Watch which describe conditions and events in Romania. Vura also testified that after the 1989 revolution in Romania, the ultra-national Vatra Romaneasca group advocated violence against Hungarians living in Romania. Following some extreme rhetoric from the ultra-national group, Vura was stopped three times on a bus and once at work for speaking Hungarian. On one occasion, a man pulled a knife on Vura for speaking Hungarian and told Vura to go back to Hungary. Nothing in the record suggests that the government was involved in these attacks or that the police were unwilling to protect Vura. Approximately a year later, Vura left for the United States.
 
 
 4
 Vura testified that while he was in the United States, his family was economically persecuted. He stated that his wife and 18-year-old son could not find employment. However, Vura testified that he worked at a factory before and after his military service, was self-employed as a painter and bricklayer for 20 years, and had no difficulty maintaining employment.
 
 
 5
 Vura testified about two additional incidents in support of his claim of economic persecution. First, Vura claims that when he attempted to authorize the withdrawal of funds from their bank in Romania his wife was unable to withdraw any money. Vura testified that he was required to fax several different forms authorizing the release of funds and after three years the bank only gave Vura's wife the equivalent of three months salary, rather than the 15 years of savings in the bank. Vura offered no evidence as to how much was originally contained in the account. Vura also testified that he had paid for a car three years before the revolution, but that, after the revolution, they were required to re-pay for the car and when they could not, they lost the car. Vura stated that these events occurred because he and his wife are Hungarian, the Romanian currency had lost value, and he is living in the United States. Vura also testified that he feared future persecution if he returned to Romania.
 
 
 6
 The United States Department of State Profile of Asylum Claims and Country Conditions for Romania (March 1996), submitted by the INS, states that since the overthrow of the Communist regime, the country has seen significant economic and political gains. The Hungarian minority is represented by its own party in the political process, and despite the slow process of privatization, Romania has avoided much of the economic strains affecting the surrounding regions. Even though the report notes that country conditions are not ideal, it states that "an ethnic Hungarian applicant faces a difficult burden in demonstrating that unusual and/or particularized circumstances render his or her ethnicity pertinent to our asylum legislation." The IJ found that while Vura may have suffered discrimination in the past, the events complained of did not rise to the level of persecution. The IJ, therefore, denied Vura's application for asylum and withholding of deportation, but granted Vura's request for voluntary departure. Vura appealed the decision to the BIA.
 
 
 7
 The BIA, after reviewing the evidence, found that Vura's treatment did not amount to past persecution because he did not show that the government was involved in any of the attacks or that the government was unwilling to protect Vura. The BIA also determined that the fact Vura's wife and son, still living in Romania, could not find work and that Vura's property was confiscated was due to factors unrelated to his ethnicity. The BIA pointed to Vura's testimony that there was a problem identifying his signature, that his wife was not authorized to access the account, and that his being in the United States was "the biggest problem." Finally, the BIA concluded that the IJ's reliance on the Department of State Profile for Romania was reasonable.
 
 
 8
 On appeal, Vura renews his argument concerning past economic persecution based on his family's inability to find employment and the problems associated with the car and withdrawal of funds. He also argues that the record compels a contrary finding than the one reached by the BIA regarding his claim of future persecution. In order to obtain a reversal, Vura "must show not merely that the record evidence supports a conclusion contrary to that reached by the BIA but that the evidence compels that contrary conclusion." Bradvica v. INS, 128 F.3d 1009, 1012 (7th Cir.1997) (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)).
 
 
 9
 Although there is evidence that ethnic Hungarians face greater discrimination today than they did before the collapse of communism, see Bucur v. INS, 109 F.3d 399, 402 (7th Cir.1997) (citing Hengan v. INS, 79 F.3d 60, 62-63 (7th Cir.1996)), Vura has not been the victim of persecution. With respect to the "attacks" Vura suffered on the bus and at work for speaking Hungarian, Vura has failed to establish any government involvement. See Nenadovic v. INS, 108 F.3d 124, 129 (7th Cir.1997); Mitev v. INS, 67 F.3d 1325, 1332 (7th Cir.1995). Vura does make the general claim that lower-ranked, local officials always carry out acts of persecution. However, Vura does not allege that the Romanian government was unwilling to protect him from the attacks, or that these lower-ranked officials were involved in the attacks. See Hengan, 79 F.3d at 62.
 
 
 10
 With respect to Vura's claim of past economic persecution, the record does not compel a conclusion contrary to that reached by the BIA. In order to succeed on this claim, Vura must show that he faces a "probability of deliberate imposition of substantial economic disadvantage" due to his Hungarian ethnicity. Borca v. INS, 77 F.3d 210, 215 (7th Cir.1996). Additionally, the economic harm must be deliberately imposed "as a form of punishment." Id. at 216 (citing Kovac v. INS, 407 F.2d 102, 107 (9th Cir.1969)).
 
 
 11
 Vura testified that he had worked for over twenty years as a painter and bricklayer. However, his wife's only previous work experience was for her husband, and his son recently finished vocational school and has no prior work experience. The lack of prior work experience may explain his family's difficulty in finding work. Moreover, Vura's claim must be evaluated in the context of the Romania economy in general. While the State Department Profile suggests that Romania has avoided much of the economic strain that has affected the region, Romania is far from a thriving economy. Nothing in the record compels a finding that Vura's wife and son are unable to find employment because of their Hungarian ancestry. In fact, Vura testified that he had no difficulty in obtaining employment because he was good at what he did and people sought him out.
 
 
 12
 Vura's inability to withdraw funds from his bank and the discrepancy over the purchase of the car also do not compel a finding contrary to the one reached by the BIA. Vura repeatedly stated that the "biggest problem" for the release of funds from the bank was that he was in the United States. Additionally, Vura testified that he was required to pay additional money for the car because the money previously used had lost all value. In short, the record does not compel a finding that Vura's wife was denied the money in Vura's account or that the car payment discrepancy occurred because Vura and his family are ethnic Hungarians.
 
 
 13
 Vura's claim of a well-founded fear of future persecution is not well-developed or supported in his brief. Vura admits to leaving Romania "relatively unscathed," but warns that ethnic hostilities could "flare up at any time." Vura makes general references to Romanian officials using ethnic intolerance for political gains, and the use of inflammatory, violent rhetoric against the Hungarians by the media.
 
 
 14
 Even though the State Department Profile reports that certain contentions remain between Romania and its Hungarian minority, the Profile also states that ethnic Hungarians face little likelihood of presenting successful asylum claims based on a well-founded fear of future persecution. The Profile details the success that the Romanian government has experienced since the transition from communism and the 1990 riots at Tirgu Mures. Vura "had better be able to point to a highly credible independent source of expert knowledge if he wants to contradict the State Department's evaluation of the likelihood of his being persecuted if he is forced to return home, an evaluation to which courts inevitably give considerable weight." Gramatikov v. INS, 128 F.3d 619, 620 (7th Cir.1997). None of the newspaper articles or Human Rights Watch reports submitted by Vura rise to such a level. They all pre-date the Profile and while the materials detail specific examples of Hungarians living in Romania, they do not support Vura's fear of future persecution. In short, the changed social and political conditions in Romania render Vura's fear of future persecution unreasonable. See Mitev, 67 F.3d at 1332.
 
 Accordingly, the decision of the BIA is
 
 15
 AFFIRMED.