Elian GONZALEZ, a minor, by and through Lazaro Gonzalez, as next friend, or, alternatively, as temporary legal custodian, Plaintiffs-Appellants,

v.

Janet RENO, Attorney General of the United States;  Doris Meissner, Commissioner, United States Immigration and Naturalization Service;  Robert Wallis, District Director, United States Immigration and Naturalization Service;  United States Immigration and Naturalization Service;  and United States Department of Justice, Defendants-Appellees,

Juan Miguel Gonzalez, Intervenor.

No. 00-11424.

United States Court of Appeals,

Eleventh Circuit.

June 1, 2000.

Appeal from the United States District Court for the Southern District of Florida.(No. 00-002606-CV-KMM), K. Michael Moore, Judge.

Before EDMONDSON, DUBINA and WILSON, Circuit Judges.

EDMONDSON, Circuit Judge:

This case, at first sight, seems to be about little more than a child and his father.  But, for this Court, the case is mainly about the separation of powers under our constitutional system of government:  a statute enacted by Congress, the permissible scope of executive discretion under that statute, and the limits on judicial review of the exercise of that executive discretion.

Elian Gonzalez ("Plaintiff"), a six-year-old Cuban child, arrived in the United States alone.  His father in Cuba demanded that Plaintiff be returned to Cuba. Plaintiff, however, asked to stay in the United States; and asylum applications were submitted on his behalf.  The Immigration and Naturalization Service ("INS")—after, among other things, consulting with Plaintiff's father and considering Plaintiff's age—decided that Plaintiff's asylum applications were legally void and refused to consider their merit.

Plaintiff then filed this suit in federal district court, seeking on several grounds to compel the INS to consider and to determine the merit of his asylum applications.  The district court dismissed Plaintiff's suit.

*Gonzalez ex rel. Gonzalez v. Reno,* 86 F.Supp.2d 1167, 1194 (S.D.Fla.2000). Plaintiff appeals,[1] and we affirm.

I.

In December 1993, Plaintiff was born in Cuba to Juan Miguel Gonzalez and Elizabeth Gonzalez. When Plaintiff was about three years old, Juan Miguel and Elizabeth separated. Elizabeth retained custody of Plaintiff after the separation. Juan Miguel, however, continued to have regular and significant contact with his son. Plaintiff, in fact, attended school in the district where his father lived and often stayed at Juan Miguel's home.

In November 1999, Elizabeth decided to leave Cuba and to take her son to the United States. In the pre-dawn hours of 22 November, Plaintiff and Elizabeth, along with twelve other Cuban nationals, left Cuba aboard a small boat. The next day, the boat capsized in strong winds and rough seas off the coast of Florida. Eleven of the passengers, including Elizabeth, died. Plaintiff, clinging to an inner tube, endured and survived.

Two days later, Plaintiff was rescued at sea by Florida fishermen and was taken to a hospital in Miami for medical treatment. While Plaintiff was receiving medical treatment, the INS was contacted by Plaintiff's great-uncle: Miami resident Lazaro Gonzalez. INS officials decided, upon Plaintiff's release from the hospital, not to remove Plaintiff immediately to Cuba. Instead, the INS deferred Plaintiff's immigration inspection and paroled Plaintiff into Lazaro's custody and care.

Soon thereafter, Lazaro filed an application for asylum on Plaintiff's behalf with the INS. This application was followed shortly by a second application signed by Plaintiff himself. A third asylum

---

[1]Several defendant-appellees are involved in this appeal. All these defendants are part of the executive branch of our government. For the sake of simplicity, we refer to the defendants collectively as the "INS."

2

application was filed by Lazaro on Plaintiff's behalf in January 2000, after a state court awarded temporary custody of Plaintiff to Lazaro.[2] The applications were prepared by a Miami lawyer.

The three applications were substantially identical in content. The applications stated that Plaintiff "is afraid to return to Cuba ." The applications claimed that Plaintiff had a well-founded fear of persecution because many members of Plaintiff's family had been persecuted by the Castro government in Cuba. In particular, according to the applications, Plaintiff's stepfather had been imprisoned for several months because of opposition to the Cuban government. Two of Plaintiff's great-uncles also had been imprisoned for their political acts. Plaintiff's mother had also been harassed and intimidated by communist authorities in Cuba. The applications also alleged that, if Plaintiff were returned to Cuba, he would be used as a propaganda tool for the Castro government and would be subjected to involuntary indoctrination in the tenets of communism.

Plaintiff's father, however, apparently did not agree that Plaintiff should remain in the United States. Soon after Plaintiff was rescued at sea, Juan Miguel sent to Cuban officials a letter, asking for Plaintiff's return to Cuba. The Cuban government forwarded this letter to the INS.

Because of the conflicting requests about whether Plaintiff should remain in the United States, INS officials interviewed both Juan Miguel and Lazaro. An INS official, on 13 December, met with Juan Miguel at his home in Cuba. At that meeting, Juan Miguel made this comment:

> [Plaintiff], at the age of six, cannot make a decision on his own .... I'm very grateful that he received immediate medical assistance, but he should be returned to me and my family .... As for him to get asylum, I am not allowing him to stay or claim any type of petition;  he should be returned immediately to me.

Juan Miguel denied that Lazaro was authorized to seek asylum for Plaintiff;  Juan Miguel also refused to consent to any lawyer representing Plaintiff. Juan Miguel assured the INS official that his desire for Plaintiff's return to Cuba was genuine and was not coerced by the Cuban government.

---

[2]A Florida state court since has dismissed Lazaro's petition for custody of Plaintiff. *See In re the Matter of Lazaro Gonzalez,* No. 00-00479-FC-28 (Fla. 11th Cir.Ct.2000).

3

One week later, INS officials in Miami met with Lazaro, Marisleysis Gonzalez (Plaintiff's cousin), and several lawyers representing Plaintiff. At that meeting, the parties discussed Juan Miguel's request. Lazaro contended that Juan Miguel's request for Plaintiff's return to Cuba was coerced by the Cuban government.[3] INS officials also inquired about the legal basis for Plaintiff's asylum applications; Lazaro replied this way: "During the time he's been here, everything he has, if he goes back, it's all changed. His activities here are different from those that he would have over there." Plaintiff's lawyers told the INS again of the persecution of Plaintiff's relatives in Cuba because of their political opposition to the Castro government.

On 31 December, an INS official again met with Juan Miguel in Cuba to investigate further Lazaro's claim that Juan Miguel's request had been coerced.[4] At that meeting, Juan Miguel repeated that he desired Plaintiff's return to Cuba. Juan Miguel also reasserted that he was under no undue influence from any individual or government. The INS official—taking Juan Miguel's demeanor into account—determined that Juan Miguel, in fact, genuinely desired his son's return to Cuba.

The INS Commissioner, on 5 January 2000, rejected Plaintiff's asylum applications as legally void. The Commissioner—concluding that six-year-old children lack the capacity to file personally for asylum against the wishes of their parents—determined that Plaintiff could not file his own asylum applications. Instead, according to the Commissioner, Plaintiff needed an adult representative to file for asylum on his behalf. The Commissioner—citing the custom that parents generally speak for their children and finding that no circumstance in this case warranted a departure from that custom—concluded that the asylum applications

[3]As proof of this contention, Lazaro told INS officials that, before Plaintiff was discovered at sea, Juan Miguel telephoned Lazaro and asked Lazaro to take care of Plaintiff if Plaintiff made it to the United States. Lazaro stated that, after Plaintiff's rescue, Juan Miguel's demeanor had changed noticeably and that, according to Juan Miguel's neighbors in Cuba, Juan Miguel was "[g]etting extra protection" from Cuban authorities.

[4]To reduce third parties' opportunities to eavesdrop upon the meeting, this interview was held at the residence of a United Nations official near Havana. Also, some of the interview was conducted in writing to prevent eavesdropping.

4

submitted by Plaintiff and Lazaro were legally void and required no further consideration. Plaintiff asked the Attorney General to overrule the Commissioner's decision; the Attorney General declined to do so.

Plaintiff then, by and through Lazaro as his next friend, filed a complaint in federal district court seeking to compel the INS to consider the merits of his asylum applications. In his complaint, Plaintiff alleged, among other things, that the refusal to consider his applications violated 8 U.S.C. § 1158 and the Fifth Amendment Due Process Clause. The district court rejected both claims and dismissed Plaintiff's complaint. Plaintiff appeals.[5]

## II.

On appeal, Plaintiff argues that the district court erred (1) by dismissing Plaintiff's claim under 8 U.S.C. § 1158, (2) by dismissing Plaintiff's due process claim, and (3) by failing to appoint a guardian ad litem to represent Plaintiff's interests.[6] We have reviewed carefully the record and the briefs filed by all parties. We conclude that Plaintiff's due process claim lacks merit and does not warrant extended discussion. *See Jean v. Nelson,* 727 F.2d 957, 968 (11th Cir.1984) (en banc) ("Aliens seeking admission to the United States ... have no constitutional rights with regard to their applications ...."), *aff'd on other grounds,* 472 U.S.

---

[5]During the pendency of this appeal, the INS revoked Plaintiff's parole and removed Plaintiff from Lazaro's custody. The INS then paroled Plaintiff into the custody of Juan Miguel, who had traveled to the United States to reclaim his son. After Juan Miguel came to the United States, we permitted Juan Miguel to intervene in this case.

To ensure that Plaintiff would not be returned to Cuba, depriving Plaintiff of a day in court and depriving this Court of jurisdiction over Plaintiff's appeal, we enjoined Plaintiff's removal from the United States pending appeal. Considering that we affirm the judgment of the district court, the injunction will dissolve (without a further order) when the Court's mandate is issued.

[6]The INS contended in district court that the district court lacked subject-matter jurisdiction over Plaintiff's suit. The district court, however, rejected this argument and concluded that subject-matter jurisdiction did exist. The INS has not renewed its jurisdictional contention on appeal.

We, however, are mindful of our own jurisdictional limits. So, we have considered our subject-matter jurisdiction over this appeal. We conclude that this Court does have subject-matter jurisdiction over Plaintiff's appeal.

846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Plaintiff's guardian ad litem claim, because Plaintiff was ably represented in district court by his next friend, also lacks merit and similarly does not warrant extended discussion. *See* Fed.R.Civ.P. 17(c) (providing for appointment of guardian ad litem in discretion of district court); *see also Roberts v. Ohio Cas. Ins. Co.,* 256 F.2d 35, 39 (5th Cir.1958) (noting that guardian ad litem may be unnecessary where child already represented adequately by next friend). We, accordingly, affirm the district court's dismissal of the constitutional claim and the district court's refusal to appoint a guardian ad litem.[7] We now turn, however, to a more difficult question: the district court's dismissal of Plaintiff's statutory claim.

III.

Plaintiff contends that the district court erred in rejecting his statutory claim based on 8 U.S.C. § 1158. Section 1158 provides that "[a]ny alien ... may apply for asylum." 8 U.S.C. § 1158(a)(1). Plaintiff says that, because he is "[a]ny alien," he may apply for asylum. Plaintiff insists that, by the applications signed and submitted by himself and Lazaro, he, in fact, did apply for asylum within the meaning of section 1158. In addition, Plaintiff argues that the summary rejection by the INS of his applications as invalid violated the intent of Congress as set out in the statute.

The INS responds that section 1158 is silent about the validity of asylum applications filed on behalf of a six-year-old child, by the child himself and a non-parental relative, against the wishes of the child's parent. The INS argues that, because the statute does not spell out how a young child files for asylum, the INS was free to adopt a policy requiring, in these circumstances, that any asylum claim on Plaintiff's behalf be filed by Plaintiff's father. As such, the INS urges that the rejection of Plaintiff's purported asylum

[7]Also before this Court is a recently filed motion of Intervenor, Juan Miguel Gonzalez, to remove Lazaro Gonzalez as Plaintiff's next friend and to substitute Plaintiff's father as next friend. Notwithstanding that much has happened since Lazaro brought this suit as Plaintiff's next friend, Lazaro (aided by a troop of seasoned lawyers) has completely and steadfastly pressed Plaintiff's claimed rights in the district court and in this Court. We see no powerful reason to make a change at this point. We, therefore, deny Intervenor's motion to remove Lazaro and to substitute Intervenor as next friend for the purposes of this litigation.

6

applications as legally void was lawful. According to the INS, because the applications had no legal effect, Plaintiff never applied at all within the meaning of the statute.

Guided by well-established principles of statutory construction, judicial restraint, and deference to executive agencies, we accept that the rejection by the INS of Plaintiff's applications as invalid did not violate section 1158.

A.

Our consideration of Plaintiff's statutory claim must begin with an examination of the scope of the statute itself. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *see also INS v. Aguirre-Aguirre,* 526 U.S. 415, 119 S.Ct. 1439, 1445, 143 L.Ed.2d 590 (1999) (instructing that analysis set out in *Chevron* is applicable to immigration statutes); *Jaramillo v. INS,* 1 F.3d 1149, 1153 (11th Cir.1993) (en banc) (same). In *Chevron,* the Supreme Court explained: "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 104 S.Ct. at 2781. We turn, therefore, to the plain language of the statute.

Section 1158 provides, in pertinent part:

> *Any alien* who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, *may apply for asylum* in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphasis added). Section 1158 is neither vague nor ambiguous. The statute means exactly what it says: "[a]ny alien ... may apply for asylum." *See Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) (observing that statute is not ambiguous just because it is broad and that statute may apply to circumstances not envisioned by Congress). That "[a]ny

7

alien" includes Plaintiff seems apparent.[8] *See* 8 U.S.C. § 1101(a)(3) (defining "alien" as "any person not a citizen or national of the United States"); *see also Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1186 (11th Cir.1997) (noting that word "any" has "an expansive meaning"). Section 1158, therefore, plainly would permit Plaintiff to apply for asylum.

When an alien does apply for asylum within the meaning of the statute, the INS—according to the statute itself and INS regulations—must consider the merits of the alien's asylum claim. *See* 8 U.S.C. § 1158(d)(1) ("The Attorney General *shall* establish a procedure for the consideration of asylum applications filed under subsection (a) of this section.") (emphasis added); 8 C.F.R. § 208.9(a) (requiring INS to "adjudicate the claim of each asylum applicant whose application is complete"). The important legal question in this case, therefore, is not whether Plaintiff *may* apply for asylum; that a six-year-old is eligible to apply for asylum is clear. The ultimate inquiry, instead, is whether a six-year-old child *has* applied for asylum within the meaning of the statute when he, or a non-parental relative on his behalf, signs and submits a purported application against the express wishes of the child's parent.

About this question, more important than what Congress said in section 1158 is what Congress left unsaid. In reading statutes, we consider not only the words Congress used, but the spaces between those words. Section 1158 is silent on the precise question at issue in this case. Although section 1158 gives "[a]ny alien" the right to "apply for asylum," the statute does not command how an alien applies for asylum. The statute includes no definition of the term "apply." The statute does not set out procedures for the proper filing of an asylum application. Furthermore, the statute does not identify the necessary contents of a valid asylum application. In short, although the statute requires the existence of some application procedure so that aliens may apply for asylum, section 1158 says nothing about the particulars of that procedure. *See* 8 U.S.C. § 1158.

B.

---

[8]The INS concedes that Plaintiff is eligible to apply for asylum pursuant to section 1158.

Because the statute is silent on the issue, Congress has left a gap in the statutory scheme.[9]  From that gap springs executive discretion.[10]  As a matter of law, it is not for the courts, but for the executive agency charged with enforcing the statute (here, the INS), to choose how to fill such gaps.[11]  *See Chevron,* 104 S.Ct.

---

[9]That Congress left a gap in the statutory scheme does not mean that Congress has done something wrong.  Whether Congress could or should legislate with sufficient detail to address every conceivable set of circumstances that might arise is highly debatable.  *See generally Loving v. United States,* 517 U.S. 748, 116 S.Ct. 1737, 1744, 135 L.Ed.2d 36 (1996) ("To burden Congress with all federal rulemaking would divert that branch from more pressing issues, and defeat the Framers' design of a workable National Government.").  Congress may properly commit something to the discretion of the other branches of government.

[10]This case is about the *discretion* of the executive branch to make policy, not about ministerial enforcement of the "law" by executive officials.  It has been suggested that the precise policy adopted by the INS in this case was required by "law."  That characterization of this case, however, is inaccurate.  As we have explained, when the INS made its pertinent policy, the preexisting law said nothing about the validity of Plaintiff's asylum applications.

> Instead, Congress just provided that "[a]ny alien" may apply for asylum and left the details of the application process to the discretion of the INS. *See Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers,* 861 F.2d 1124, 1140 (9th Cir.1988) (en banc) (Hug, J., dissenting) (explaining that sometimes "Congress enacts quite general provisions, with the specifics to be filled in by the agency").  The INS, in its discretion, decided to require six-year-old children—who arrive unaccompanied in the United States from Cuba—to act in immigration matters only through (absent special circumstances) their parents in Cuba. The INS could have shaped its policy in a different fashion, perhaps allowing relatives (for example, those within the fourth degree of relationship) in the United States to act for such children.  But it did not, and we cannot.  That choice was the sole prerogative of the executive branch.  According to the principles set out in *Chevron,* we can only disturb that choice if it is unreasonable.  *See Chevron,* 104 S.Ct. at 2793;  *see also Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 678, 102 L.Ed.2d 714 (1989) (Scalia, J., dissenting) (explaining discretionary authority of executive branch in administering statutory scheme).

[11]When a statute is ambiguous or silent on the pertinent issue, it ordinarily is for the judicial branch to construe the statute.  *See generally Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  But the ordinary rule does not always apply:  where Congress has indicated that gaps in the statutory scheme should be filled in by officers of the executive branch (a political branch accountable to the people and fit for making policy judgments), then the gaps should not be filled in by federal judges.  Where Congress has committed the enforcement of a statute to a particular executive agency, Congress has sufficiently indicated its intent that statutory gaps be filled by the executive agency.  And the Supreme Court has directed that, for such statutes, if "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute .... Rather, if the statute is silent ... the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron,* 104 S.Ct. at 2782.

9

at 2793. Moreover, the authority of the executive branch to fill gaps is especially great in the context of immigration policy.[12] *See Aguirre-Aguirre,* 119 S.Ct. at 1445. Our proper review of the exercise by the executive branch of its discretion to fill gaps, therefore, must be very limited. *See Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991).

That the courts owe some deference to executive policy does not mean that the executive branch has unbridled discretion in creating and in implementing policy. Executive agencies must comply with the procedural requirements imposed by statute. *See Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974). Agencies must respect their own procedural rules and regulations. *See id.* at 1074; *see also Hall v. Schweiker,* 660 F.2d 116, 119 (5th Cir.1981). And the policy selected by the agency must be a reasonable one in the light of the statutory scheme. *Chevron,* 104 S.Ct. at 2782. To this end, the courts retain the authority to check agency policymaking for procedural compliance and for arbitrariness. But the courts cannot properly reexamine the wisdom of an agency-promulgated policy .[13] *See SEC v. Chenery Corp.,* 332

---

[12]The authority of the executive branch in immigration matters stems from the primacy of the President and other executive officials (such as the INS) in matters touching upon foreign affairs. *See Aguirre-Aguirre,* 119 S.Ct. at 1445. Respect for the authority of the executive branch in foreign affairs is a well-established theme in our law. *See United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936) (recognizing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"). And the judicial respect for executive authority in matters touching upon foreign relations is even greater where the presidential power has been affirmed in an act of Congress. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."); *see also United States v. Frade,* 709 F.2d 1387, 1402 (11th Cir.1983) (same).

[13]The Supreme Court has instructed us with these words:

> [F]ederal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches."

*Chevron,* 104 S.Ct. at 2793 (citation omitted).

U.S. 194, 67 S.Ct. 1575, 1582, 91 L.Ed. 1995 (1947) ("The wisdom of the principle adopted is none of our concern.").

In this case, because the law—particularly section 1158—is silent about the validity of Plaintiff's purported asylum applications, it fell to the INS to make a discretionary policy choice. The INS, exercising its gap-filling discretion, determined these things: (1) six-year-old children lack the capacity to sign and to submit personally an application for asylum; (2) instead, six-year-old children must be represented by an adult in immigration matters; (3) absent special circumstances, the only proper adult to represent a six-year-old child is the child's parent, even when the parent is not in this country; and, (4) that the parent lives in a communist-totalitarian state (such as Cuba),[14] in and of itself, does not constitute a special circumstance requiring the selection of a non-parental representative. Our duty is to decide whether this policy might be a reasonable one in the light of the statutory scheme. *See Chevron,* 104 S.Ct. at 2782.

But we first address Plaintiff's contention that the "policy" relied on by the INS in this case is really no policy at all but is, in reality, just a litigating position. An after-the-fact rationalization of agency action—an explanation developed for the sole purpose of defending in court the agency's acts—is usually entitled to no deference from the courts. *Bradberry v. Director, Office of Workers' Comp. Programs,* 117 F.3d 1361, 1366 (11th Cir.1997). But we are unable to say that the position of the INS here is just an after-the-fact rationalization.

The INS policy toward Plaintiff's application was not created by INS lawyers during litigation, but instead was developed in the course of administrative proceedings before litigation commenced.[15] *Cf. IAL*

---

[14]*See* U.S. Dept. of State, 1999 Country Reports on Human Rights Practices: Cuba (2000) (noting that "Cuba is a totalitarian state," where Communist Party "exercises control over all aspects of Cuban life").

[15]The INS policy on unaccompanied six-year-old children purporting to file for asylum against their parents' wishes was set out in these writings: (1) a memorandum, dated 3 January 2000, from the INS General Counsel to the INS Commissioner; (2) two letters, dated 5 January, from an INS district director to Plaintiff's lawyers and Lazaro, letters explaining the decision of the INS Commissioner; and (3) a letter, dated 12 January, from the Attorney General to Plaintiff's lawyers and Lazaro.

*Aircraft Holding, Inc. v. FAA,* 206 F.3d 1042, 1046 & n. 5 (11th Cir.2000). While the policy announced by the INS may not harmonize perfectly with earlier INS interpretative guidelines (which are not law),[16] the parties have cited, and we have found, no statutory provision, no regulatory authority, and no prior agency adjudication that "flatly contradicts" the policy. *Cf. General Elec. Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (noting that agencies have latitude to "adapt their rules and policies to the demands of changing circumstances"). That the INS policy was developed in the course of an informal adjudication, rather than during formal rulemaking, may affect the degree of deference appropriate but does not render the policy altogether unworthy of deference. *See Chenery,* 67 S.Ct. at 1580; *see also Cook v. Wiley,* 208 F.3d 1314, 1319-20 (11th Cir.2000) (explaining that executive policies not "subjected to the heightened scrutiny of [formal] rulemaking" are nonetheless entitled to "some deference"); *Bigby v. INS,* 21 F.3d 1059, 1063-64 (11th Cir.1994) (finding *Chevron* deference appropriate even though agency policy had not been adopted as regulation); *U.S. Mosaic Tile Co. v. NLRB,* 935 F.2d 1249, 1255 n. 6 (11th Cir.1991) ("Although the agency action in *Chevron* involved a legislative regulation, the deference standards set forth in that case are now applied to most agency actions, including administrative adjudications ...."). And that the INS policy may not be a longstanding one likewise affects only the degree of deference required.[17] *See Chenery,* 67 S.Ct. at 1580. The INS policy, therefore, is entitled to, at least, some deference

---

[16]The INS Guidelines "do not have the force and effect of law." *Haitian Refugee Ctr., Inc. v. Baker,* 953 F.2d 1498, 1511 (11th Cir.1992).

[17]The INS claims that the approach taken in Plaintiff's case is the INS's longstanding position on young, unaccompanied aliens. The INS, however, points to no evidence in the record showing that the INS, in the past, has taken this approach. But, even assuming that Plaintiff's case triggered the making of this policy to fit cases like Plaintiff's peculiar circumstances, deference to the INS policy would still be due if the policy is a reasonable one. *See Chenery,* 67 S.Ct. at 1580 ("[P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule.").

under *Chevron;* and that deference, when we take account of the implications of the policy for foreign affairs, becomes considerable.

We accept that the INS policy at issue here comes within the range of reasonable choices. First, we cannot say that the foundation of the policy—the INS determination that six-year-old children necessarily lack sufficient capacity to assert, on their own, an asylum claim—is unreasonable.[18] *See Polovchak v. Meese,* 774 F.2d 731, 736-37 (7th Cir.1985) (presuming that twelve-year-old child was "near the lower end of an age range in which a minor may be mature enough to assert" an asylum claim against the wishes of his parents). Because six-year-old children must have some means of applying for asylum, *see* 8 U.S.C. § 1158(a)(1), and because the INS has decided that the children cannot apply personally, the next element of the INS policy—that a six-year-old child must be represented by some adult in applying for asylum—necessarily is reasonable.

---

[18]In other words, we do not think that the INS, as a matter of law, must individually assess each child's mental capacity; we cannot say that looking at capacity instead of age for young children is required. Instead, we recognize that absolute line drawing—although necessarily sacrificing accuracy and flexibility for certainty and efficiency—is an acceptable approach. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 2567-68, 49 L.Ed.2d 520 (1976). And, as long as the approach taken by the INS is a reasonable one, we need not decide what the best approach would be.

We, however, do not mean to suggest that the course taken by the INS is the only permissible approach. Although the INS is not required to let six-year-old children speak for themselves about asylum, neither is the INS required to ignore the expressed statements of young children. Even young children can be capable of having an accurate impression of the facts about which they might speak. To obtain asylum, we doubt that it is essential for a child to be able to debate the merits of Marxism-Leninism against the merits of Western-style democracy. Some reasonable people could conclude that it should be sufficient for a child to be able to speak about his fears and to recount the facts that support his fears about returning to another country. Not infrequently, the law does permit six-year-old children (and even younger children) to speak and, in fact, does give their words great effect. *See, e.g., Pocatello v. United States,* 394 F.2d 115, 116-17 (9th Cir.1968) (affirming district court's admission of five-year-old's testimony); *Miller v. State,* 391 So.2d 1102, 1106 (Ala.Crim.App.1980) (affirming decision of trial court to permit four-year-old to testify); *Baker v. State,* 674 So.2d 199, 200 (Fla.Dist.Ct.App.1996) (affirming trial court decision admitting testimony and statements of six-year-old victim).

13

The INS determination that ordinarily a parent (even one outside of this country)[19]—and, more important, *only* a parent—can act for his six-year-old child (who is in this country) in immigration matters also comes within the range of reasonable choices. In making that determination, INS officials seem to have taken account of the relevant, competing policy interests: the interest of a child in asserting a non-frivolous asylum claim; the interest of a parent in raising his child as he sees fit; and the interest of the public in the prompt but fair disposition of asylum claims. The INS policy—by presuming that the parent is the sole, appropriate representative for a child—gives paramount consideration to the primary role of parents in the upbringing of their children. But we cannot conclude that the policy's stress on the parent-child relationship is unreasonable.[20] *See Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968)

[19]We conclude that the approach taken by the INS about out-of-the-country representatives was a reasonable one. Other approaches might have been available. The INS might have selected a policy giving more weight to the fact that the parent of a child in the United States remained outside of this country's jurisdiction. For example, maybe the INS could have required that the adult representative—purporting to act in immigration matters (either by applying for asylum on behalf of the child or in effect vetoing an application for asylum) for a child in this country—be present in this country himself at the pertinent time. *See, e.g., Cozine v. Bonnick,* 245 S.W.2d 935, 937 (Ky.1952) (requiring that next friend, purporting to represent child in court, be resident of state). But what else might have been done is not decisive for us.

[20]We do not suggest that recognizing the parent-child relationship to the exclusion of other familial relationships is the only reasonable approach. The parent-child relationship is obviously an important one. *See Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 1541-42, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *see also In re Custody of Smith,* 137 Wash.2d 1, 969 P.2d 21, 27-28 (Wash.1998), *cert. granted sub nom. Troxel v. Granville,* --- U.S. ----, 120 S.Ct. 11, 144 L.Ed.2d 842 (1999). Still, although the common practice in the courts of this country seems to be that a parent will be appointed to act as next friend for a child, a parent is not usually entitled to be the next friend of his child as a matter of absolute right. *See Fong Sik Leung v. Dulles,* 226 F.2d 74, 82 (9th Cir.1955) ("[No] parent [ ] may claim to be a guardian ad litem of his minor child as a matter of right."). Especially because the best interests of a child and the best interests of even a loving parent can clash, parental authority over children—even where the parent is not generally "unfit"—is not without limits in this country. *See, e.g., In the Matter of Sampson,* 37 A.D.2d 668, 323 N.Y.S.2d 253, 255 (N.Y.App.Div.1971) (affirming order requiring disfigured child to undergo risky cosmetic surgery against genuine wishes of child's only parent: the state contended surgery would have "a beneficial effect" upon child); *Crommelin-Monnier v. Monnier,* 638 So.2d 912, 916 (Ala.Civ.App.1994) (requiring appointment of guardian ad litem where custodial parent sought to remove child to foreign country). In addition, the law in the United States frequently treats more distant familial relationships as important. *See, e.g.,* Kan. Stat. Ann. § 38-1541 (permitting any person related within the fourth degree to child to move to intervene in "child in need of care" proceedings); Ala.Code § 12-16-150(4) (allowing challenge

("[T]he parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.").

Critically important, the INS policy does not neglect completely the independent and separate interest that a child may have, apart from his parents, in applying for asylum. *See Polovchak,* 774 F.2d at 736-37. Instead, according to the INS policy, special circumstances may exist that render a parent an inappropriate representative for the child.[21] Where such circumstances do exist, the INS policy appears to permit other persons, besides a parent, to speak for the child in immigration matters. So, to some extent, the policy does protect a child's own right to apply for asylum under section 1158 despite the contrary wishes of his parents.

We are not untroubled by the degree of obedience that the INS policy appears to give to the wishes of parents, especially parents who are outside this country's jurisdiction. Because Congress has decided that "[a]ny alien" (including six-year-old children) may apply for asylum, 8 U.S.C. § 1158(a)(1), Congress has charged the INS—when it promulgates policy and fills gaps in the statutory scheme—with facilitation, not hindrance, of that legislative goal. *See Shoemaker v. Bowen,* 853 F.2d 858, 861 (11th Cir.1988) (noting that *Chevron* does not provide agency with license to "frustrate[ ] the underlying congressional policy"). We recognize that, in some instances, the INS policy of deferring to parents—especially those residing outside of this country—might hinder some six-year-olds with non-frivolous asylum claims and prevent them from invoking their statutory right to seek asylum. But, considering the well-established principles of judicial deference to executive agencies, we cannot disturb the INS policy in this case just because it might be imperfect. *See Industrial Union Dept., AFL-CIO v. American Petroleum Inst.,* 448 U.S. 607, 100 S.Ct. 2844,

---

for cause where potential juror is related within ninth degree to party); O.C.G.A. § 15-12-135(a) (disqualifying persons related within the sixth degree to interested parties from jury service).

[21]Under the INS policy, a substantial conflict of interest between the parent and the child may require or allow another adult to speak for the child on immigration matters. In considering whether a substantial conflict of interest exists, the INS considers the potential merits of a child's asylum claim. If the child would have an exceedingly strong case for asylum, the parent's unwillingness to seek asylum on that child's behalf may indicate, under the INS policy, that the parent is not representing adequately the child's interests.

2875, 65 L.Ed.2d 1010 (1980) (Burger, C.J., concurring) (noting that agency policy may be valid although policy does not perfectly accomplish legislative goals). And we cannot invalidate the policy—one with international-relations implications—selected by the INS merely because we personally might have chosen another. *See Chevron,* 104 S.Ct. at 2793; *see also Jaramillo,* 1 F.3d at 1152-53. Because we cannot say that this element of the INS policy—that, ordinarily, a parent, and only a parent, can act for a six-year-old child in immigration matters—is unreasonable, we defer to the INS policy.

The final aspect of the INS policy also worries us some. According to the INS policy, that a parent lives in a communist-totalitarian state is no special circumstance, sufficient in and of itself, to justify the consideration of a six-year-old child's asylum claim (presented by a relative in this country) against the wishes of the non-resident parent. We acknowledge, as a widely-accepted truth, that Cuba does violate human rights and fundamental freedoms and does not guarantee the rule of law to people living in Cuba.[22] *See generally* U.S. Dept. of State, 1999 Country Reports on Human Rights Practices: Cuba (2000) ("[The Cuban Government] continue[s] systematically to violate fundamental civil and political rights of its citizens."). Persons living in such a totalitarian state may be unable to assert freely their own legal rights, much less the legal rights of others. Moreover, some reasonable people might say that a child in the United States inherently has a substantial conflict of interest with a parent residing in a totalitarian state when that parent—even when he is not coerced—demands that the child leave this country to return to a country with little respect for human rights and basic freedoms.

---

[22]According to the United States Department of State, the human rights record of the Cuban government is "poor." Cuban citizens who oppose or criticize the government routinely are "harass[ed], threaten[ed], arbitrarily arrest[ed], detain[ed], imprison[ed], and defame[d]." Cuba regularly denies citizens "the freedoms of speech, press, assembly, and association," and restricts the free exercise of religion. The Cuban constitution provides that "legally recognized civil liberties can be denied to anyone who actively opposes the 'decision of the Cuban people to build socialism.' " *See* U.S. Dept. of State, 1999 Country Reports on Human Rights Practices: Cuba (2000); *see also* UNHCHR Res.2000/25, U.N. Comm. on Human Rights, 56th Sess., U.N. Doc. E/CN.4/2000/L.11 (2000) (expressing concern about "the continued violation of human rights and fundamental freedoms in Cuba").

16

Nonetheless, we cannot properly conclude that the INS policy is totally unreasonable in this respect. The INS policy does take some account of the possibility of government coercion: where special circumstances—such as definite coercion directed at an individual parent—exist, a non-parental representative may be necessary to speak for the child. In addition and more important, in no context is the executive branch entitled to more deference than in the context of foreign affairs. *See generally United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936). This aspect of the INS policy seems to implicate the conduct of foreign affairs more than any other. Something even close to a per se rule—that, for immigration purposes, no parent living in a totalitarian state has sufficient liberty to represent and to serve the true, best interests of his own child in the United States—likely would have significant consequences for the President's conduct of our Nation's international affairs: such a rule would focus not on the qualities of the particular parent, but on the qualities of the government of the parent's country. As we understand the legal precedents, they, in effect, direct that a court of law defer especially to this international-relations aspect of the INS policy.

We are obliged to accept that the INS policy, on its face, does not contradict and does not violate section 1158, although section 1158 does not require the approach that the INS has chosen to take.

C.

We now examine the INS's application of its facially reasonable policy to Plaintiff in this case. Although based on a policy permissible under *Chevron,* if the ultimate decision of the INS—to treat Plaintiff's asylum applications as invalid—was "arbitrary, capricious, [or] an abuse of discretion," the decision is unlawful.[23] *See* 5 U.S.C. § 706(2)(A); *see also INS v. Yueh-Shaio-Yang,* 519 U.S. 26, 117 S.Ct. 350, 353, 136 L.Ed.2d 288 (1996); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 822,

---

[23]The INS asks us to apply the "facially legitimate and bona fide reason" standard of review set out in *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972), instead of the more stringent "arbitrary, capricious, or an abuse of discretion" standard. We think that the *Kleindienst* standard is not the correct standard to apply in this case. But we do note that, even if the *Kleindienst* standard were applied, the result in this case would remain the same.

17

28 L.Ed.2d 136 (1971). But whatever we personally might think about the decisions made by the Government, we cannot properly conclude that the INS acted arbitrarily or abused its discretion here.

The application signed and submitted by Plaintiff himself, insofar as the INS has decided that six-year-old children cannot file for asylum themselves, necessarily was a nullity under the INS policy. As we have explained, the INS's per se rule—prohibiting six-year-old children from personally filing asylum applications against their parents' wishes—is entitled to deference under the law. The INS, therefore, did not act arbitrarily or abuse its discretion in rejecting Plaintiff's own purported asylum application as void.

Plaintiff contends that, even if the INS policy is facially reasonable under *Chevron,* the INS decision to reject the applications submitted by Lazaro was arbitrary. Plaintiff asserts that two special circumstances—the alleged coercion of Juan Miguel by the Cuban government and the objective basis of Plaintiff's asylum claim—bear negatively upon Juan Miguel's fitness to represent Plaintiff in immigration matters. The INS, according to Plaintiff, was therefore required to recognize some other adult representative—namely, Lazaro—to act on Plaintiff's behalf. We, however, conclude that the INS adequately considered these circumstances in reaching its ultimate decision.

The INS first determined that Juan Miguel, in fact, was not operating under coercion from the Cuban government or that, even if he was, his honest and sincere desires were aligned with those of the Cuban government. That determination was not clearly wrong and was no abuse of discretion. An INS official, on two occasions, interviewed Juan Miguel in person in Cuba. Aware of the possibility that Juan Miguel might be under some kind of coercion, the INS official took steps to ensure that Juan Miguel could express freely his genuine wishes about Plaintiff's asylum claim. The INS official, after meeting with Juan Miguel face-to-face, concluded—based upon her observations of his demeanor—that Juan Miguel's statement was not the result of duress or coercion. We, therefore, cannot say that the INS's rejection of Plaintiff's contention about coercion was arbitrary.

18

The INS also preliminarily assessed the objective basis of Plaintiff's asylum claim and concluded that his claim for asylum probably lacked merit.[24] Again, we cannot conclude that the INS's determination was arbitrary or an abuse of discretion. In making this assessment, the INS considered the information contained in the asylum applications and information provided to the INS by Plaintiff's lawyers. In addition, the INS interviewed Lazaro and inquired about the basis for Plaintiff's asylum claim.[25]

The essence of Plaintiff's asylum claim was that, if he is returned to Cuba: (1) he will not enjoy the freedom that he has in the United States; (2) he might be forced to undergo "re-education" and indoctrination in communist theory; and (3) he might be used by the Cuban government for propaganda purposes. No one should doubt that, if Plaintiff returns to Cuba, he will be without the degree of liberty that people enjoy in the United States. Also, we admit that re-education, communist indoctrination, and political manipulation of Plaintiff for propaganda purposes, upon a return to Cuba, are not beyond the realm of possibility.

Nonetheless, we cannot say that the INS's assessment of Plaintiff's asylum claim—that it probably lacked merit—was arbitrary. To make a meritorious asylum claim, an asylum applicant must show that he has a "well-founded fear of persecution" in his native land. *See* 8 U.S.C. § 1101(a)(42). Congress largely has left the task of defining with precision the phrase "well-founded fear of persecution" to the INS. *See Perlera-Escobar v. Executive Office for Immigration,* 894 F.2d 1292, 1296 (11th Cir.1990) (stating that, where statutory term is ambiguous, agency properly defined term through adjudications); *see also Singh v. INS,* 134 F.3d 962, 967 (9th Cir.1998) (noting that statutes do not define "persecution" or specify acts constituting "persecution").

---

[24]We do not decide, as the INS advocates, that this summary and preliminary assessment of the merits of Plaintiff's asylum claim was a "consideration" of Plaintiff's purported asylum application within the meaning of the statute. But we do accept that this rough look at the potential merits was a legitimate part of deciding whether Plaintiff's father had a substantial conflict of interest with Plaintiff about asylum that would disqualify the father from representing Plaintiff.

[25]That the INS, in making a preliminary assessment of the strength of Plaintiff's asylum claim, never interviewed Plaintiff has worried us. But the INS did speak with persons representing Plaintiff—Lazaro, Marisleysis, and Plaintiff's lawyers—on more than one occasion about the nature of his asylum claim.

19

Plaintiff points to no earlier INS adjudications or judicial decisions where a person, in circumstances similar to Plaintiff's, was found to have established a "well-founded fear of persecution." Political conditions "which affect the populace as a whole or in large part are generally insufficient to establish [persecution]." *See Mitev v. INS,* 67 F.3d 1325, 1330 (7th Cir.1995). We cannot say that the INS had to treat education and indoctrination as synonymous with "persecution." *See Ghaly v. INS,* 58 F.3d 1425, 1431 (9th Cir.1995) (explaining that "persecution is an extreme concept that does not include every sort of treatment our society regards as offensive"); *see also Mikhailevitch v. INS,* 146 F.3d 384, 390 (6th Cir.1998) (stating that "persecution" "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty"); *Bradvica v. INS,* 128 F.3d 1009, 1012 (7th Cir.1997) ("[M]ere harassment does not amount to persecution."); Ira J. Kurzban, *Kurzban's Immigration Law Sourcebook,* 254-61 (6th ed.1998) (citing cases discussing meaning of "persecution"). Not all exceptional treatment is persecution. The INS's estimate of the purported applications—as applications that were not strong on their merits—is not clearly inaccurate.[26]

We have not the slightest illusion about the INS's choices: the choices—about policy and about application of the policy—that the INS made in this case are choices about which reasonable people can disagree. Still, the choices were not unreasonable, not capricious and not arbitrary, but were reasoned and reasonable. The INS's considerable discretion was not abused.

CONCLUSION

---

[26]We do not know for certain that, if Plaintiff's asylum applications were accepted and fully adjudicated, Plaintiff necessarily would fail to establish his eligibility for asylum. Depending on how the record was developed, we expect that a reasonable adjudicator might find that Plaintiff's fears were "well-founded." We also think that some reasonable adjudicator might regard things like involuntary and forcible "re-education" as persecution. But these issues are not questions that we, in the first instance, are to answer. The ultimate merits of an asylum petition are not before this Court at all. Instead, they are matters that would be committed to the discretion of the INS. The INS (and the courts) never have suggested that an asylum applicant in like circumstances was eligible for asylum. We cannot say that the INS's assessment of the likelihood of success of the applications in this case was arbitrary.

20

As policymakers, it is the duty of the Congress and of the executive branch to exercise political will. Although courts should not be unquestioning, we should respect the other branches' policymaking powers. The judicial power is a limited power. It is the duty of the judicial branch not to exercise political will, but only to render judicial judgment under the law.

When the INS was confronted with Plaintiff's purported asylum applications, the immigration law of the United States provided the INS with no clear answer. The INS accordingly developed a policy to deal with the extraordinary circumstances of asylum applications filed on behalf of a six-year-old child, by the child himself and a non-parental relative, against the express wishes of the child's parents (or sole parent). The INS then applied this new policy to Plaintiff's purported asylum applications and rejected them as nullities.

Because the preexisting law compelled no particular policy, the INS was entitled to make a policy decision. The policy decision that the INS made was within the outside border of reasonable choices. And the INS did not abuse its discretion or act arbitrarily in applying the policy and rejecting Plaintiff's purported asylum applications. The Court neither approves nor disapproves the INS's decision to reject the asylum applications filed on Plaintiff's behalf, but the INS decision did not contradict 8 U.S.C. § 1158.

The judgment of the district court is AFFIRMED[27].

---

[27]NOTICE OF SHORTENED TIME: We order that, if petitions for rehearing or suggestions for rehearing en banc are to be filed, they must be filed within 14 days of this date. Expect no extensions.